**COMMONWEALTH of Pennsylvania,
Appellee,**

v.

**Omar JOHNSON, Appellant.**

**No. 1158 EDA 2005.**

Superior Court of Pennsylvania.

Argued Nov. 14, 2006.

Filed March 12, 2007.

Peter Rosalsky, Public Defender, Philadelphia, for appellant.

Hugh J. Burns, Jr. and Lloyd Long, III, Asst. Dist. Attys., for the Com., appellee.

BEFORE: STEVENS, KLEIN, and PANELLA, JJ.

OPINION BY STEVENS, J.:

¶ 1 Following a waiver trial, Appellant Omar Johnson was convicted of Possession with the Intent to Deliver[1] and Criminal Conspiracy[2] on February 15, 2005. Appellant appeals from the judgment of sentence entered in the Court of Common Pleas of Philadelphia County on March 14, 2005, at which time Appellant was sentenced to the mandatory minimum sentence of three (3) years to six (6) years in prison which was to be followed by one year of probation.[3] We affirm.

¶ 2 The salient facts and procedural history are as follows: Officer Rich Gramlich testified that on June 16, 2004, he was working in the Narcotics Field Unit in Philadelphia and came in contact with Appellant at approximately 2:20 p.m.[4] Officer Gramlich had contacted Appellant earlier via telephone and requested a bundle of party brand heroin and three oxycontin–40s. Appellant instructed Officer Gram-

lich to come to the corner of Seventh Street and Girard Avenue in Philadelphia to complete the transaction.

¶ 3 When he arrived at the 600 block of Girard Avenue in an unmarked police car, Officer Gramlich met with Appellant and asked him to enter his vehicle. Once Appellant got inside the front passenger side of the vehicle, Officer Gramlich asked him "for three oxy–40s and a bundle of party heroin." Appellant asked Officer Gramlich to wait and then exited the vehicle after which he went to speak to another male in a nearby doughnut shop. The men then proceeded to a bar across the street from where Officer Gramlich was seated, and motioned for someone to join them.

¶ 4 A man later identified as Raheem Stoner, another unknown black male, and Appellant sat inside a green Chevrolet Lumina for less than one minute, after which Appellant exited the vehicle and returned to Officer Gramlich and handed him eleven (11) packets of heroin stamped "party" and two oxycontin pills (120 milligrams total) in exchange for $180.00 in prerecorded buy-money. Having completed the transaction, Appellant returned to the Chevrolet, and Officer Gramlich left the area. A back-up officer observed Appellant hand the money to Mr. Stoner. Officer Gramlich, certified in drug testing, tested one packet of the eleven and determined it tested positive for the presence of heroin.

¶ 5 Officer Gramlich came in contact with Appellant for a second time on June 30, 2004, after the former had called the latter and scheduled another drug purchase. Appellant once again directed Officer Gramlich to the area of Seventh Street

1.   35 P.S. § 780–113(a)(30).

2.   18 P.S. § 903.

3.   The mandatory minimum was imposed pursuant to 18 Pa.C.S.A. § 7508(a)(7).

4.   Unless otherwise noted, all facts are drawn from the notes of testimony from the February 15, 2005, waiver trial.

and Girard Avenue where the two met. Officer Gramlich requested the same quantity of drugs as he had the prior time, but Appellant noted it may be difficult to obtain three oxycontin pills at that time of the day.

¶ 6 Appellant entered the bar on the southeast corner of Seventh Street and Girard Avenue and remained there for less than two minutes before emerging and handing Officer Gramlich one eighty milligram oxycontin pill in exchange for $50.00. After completing this part of the transaction, Appellant left the area in a gold, Mercury Topaz and was followed by back-up officers until he met an unknown black male. The unknown individual and Appellant engaged in a brief conversation, after which the former handed the latter an object. When he returned to Officer Gramlich, Appellant admonished the Officer for not calling ahead with his order and then accepted $120.00 in exchange for a bundle of thirteen (13) packets of heroin stamped "polo" which he pulled from his sock. Officer Gramlich tested one packet from this bundle and once again found the contents to be heroin.

¶ 7 On July 6, 2004, Officer Gramlich's investigation continued when he again called Appellant and scheduled a third narcotics purchase for one bundle of heroin and one oxy eighty milligram pill. When Officer Gramlich arrived at the intersection of Seventh Street and Girard Avenue, Appellant entered his unmarked car and, as before, gave Officer Gramlich a bundle containing twelve (12) packs of heroin which were marked "check due." A later test of one packet from the bundle rendered a positive result for heroin.

¶ 8 Officer Gramlich asked Appellant if he could purchase another bundle, because he was hoping this purchase might reveal a bigger source. Appellant exited the vehicle to make a phone call, and Officer Gramlich overheard Appellant request "one juan." Appellant re-entered Officer Gramlich's vehicle and instructed him to drive north on Seventh Street. When they reached the intersection of Seventh and Master Streets, Appellant asked Officer Gramlich to pull over and stop the vehicle.

¶ 9 Officer Gramlich parked his car, and Appellant exited his vehicle and immediately proceeded to a gold Buick, operated by William Wilson. Mr. Wilson exited the vehicle, shook hands with Appellant and engaged him in conversation. Mr. Wilson then reached into the front passenger side of the Buick, retrieved something and handed the object to Appellant. Appellant returned to Officer Gramlich's car and handed him one bundle of heroin containing thirteen (13) packets stamped "new era" in exchange for $120.00. As had been the case each time before, Officer Gramlich later tested a packet from this bundle which was positive for heroin.

¶ 10 Before leaving the area, Officer Gramlich observed Appellant reach into his pocket, pull out additional currency, and count the entire wad of cash as he walked back to Mr. Wilson. Appellant handed some money to Mr. Wilson, shook his hand, and returned to Officer Gramlich's vehicle. The pair returned to the laundromat, after which Officer Gramlich notified his back-up officers to arrest Appellant. Both Appellant and Mr. Wilson were arrested. A later search of the Buick pursuant to a warrant revealed another bundle of heroin containing twelve (12) packets marked "new era."

¶ 11 Officer Renee Russell testified that based upon information she obtained from Officer Gramlich, she placed Mr. Wilson under arrest on July 6, 2004. At that time, she recovered $509.00 of United States currency, along with $80.00 prerecorded buy-money, a cell phone and the

keys to a Buick Park Avenue by which Mr. Wilson was standing.

¶ 12 Officer Kevin Keys testified on July 6, 2004, he, along with Officer Starling, arrested Appellant. At that time, Officer Keys confiscated $140.00 in prerecorded buy-money, along with an additional $333.00 and two cell phones. One of the cell phones rang when Officer Gramlich called the number he had been utilizing to contact Appellant.

¶ 13 At the conclusion of testimony [5] and after hearing counsels' argument, the trial court convicted Appellant of Possession with the Intent to Deliver and Criminal Conspiracy. The trial court deferred sentencing in an effort to afford both sides an opportunity to brief the issue of whether Appellant should be sentenced as having possessed the mandatory amount of narcotics with the intent to deliver at one time or at different times.[6] Counsel for the Commonwealth indicated that combined the "check due" and "new era" bundles weighed 1.043 grams. N.T., 2/15/05, at 68. Defense counsel stated that the three tested samples were fifty-six (56) milligrams, twenty-seven (27) milligrams, and twenty-three (23) milligrams. N.T., 2/15/05, at 69. The Police Report indicates that on July 6, 2004, a total amount of 1.47 grams of heroin was confiscated, while the Philadelphia Police Department Chemistry Laboratory Report reveals the following: the "check due" bundle sample contained 28 milligrams of heroin; the "new era" packet tested from the bundle Appellant sold to Officer Gramlich contained 27 milligrams

of heroin; the "new era" sample obtained from the bundle confiscated from Mr. Wilson's car contained 36 milligrams of heroin. See Brief for Appellant, Exhibit "B." The weight of each bundle was determined by multiplying the weight of the individual bag tested by the total number of bags recovered in the bundle.[7]

¶ 14 On March 14, 2005, after hearing further argument, the sentencing court sentenced Appellant to a mandatory minimum sentence of three (3) years to six (6) years in prison followed by one (1) year of probation. The sentencing court also ordered that this sentence run concurrently to a prior sentence which Appellant had been serving.

¶ 15 On April 6, 2005, Appellant filed a timely Notice of Appeal.[8] On June 7, 2005, Appellant was ordered to file a Statement of Matters Complained of on Appeal within fourteen (14) days. Appellant did so on June 13, 2005. Thereafter, on May 26, 2006, the trial court filed its Opinion.

¶ 16 In his brief, Appellant raises the following four (4) arguments for our review:

1.  The evidence was insufficient to sustain the conviction for criminal conspiracy.

2.  The Commonwealth failed to adequately establish the total weight of the heroin involved because weighing only one packet per bundle is not a sufficient basis upon which to extrapolate the weight of the re-

---

5.  No defense witnesses took the stand.

6.  Appellant had previously been convicted of drug trafficking offenses, and the sentencing court determined the amount of narcotics in question was in excess of one gram.

7.  Our calculation utilizing the amounts contained in the Laboratory Report would render

a total of 1.119 grams of heroin. Regardless of which measurements are utilized, the combined heroin retrieved from the two bundles Appellant sold to Officer Gramlich and that found in the Buick exceeds one gram.

8.  No post-sentence motions were filed.

maining non-weighed packets in that bundle.

3. The trial court erred in combining the weight of drugs involved in separate and distinct transactions when determining the weight thresholds required for section 7508.

4. Even if limited only to July 6, Appellant still did not traffic the one gram of heroin required by section 7508 because, *inter alia*, he did not "jointly constructively possess" the drugs inside of Wilson's car.

Brief for Appellant at ii. We will consider each of these arguments in turn.

¶ 17 We begin our analysis by noting that Appellant's Pa.R.A.P.1925(b) statement spans four (4) pages, though it raises only four issues. This Court has explained in *Riley v. Foley*, 783 A.2d 807, 813 (Pa.Super.2001), that Pa.R.A.P.1925 is a crucial component of the appellate process in that it allows the trial court to identify and focus upon those issues the parties plan to raise on appeal. This Court has also explained that "a Concise Statement which is too vague to allow the [trial] court to identify the issues raised on appeal is the functional equivalent to no Concise Statement at all." *Commonwealth v. Dowling*, 778 A.2d 683, 686–87 (Pa.Super.2001). Herein, "the statement's length is attributable almost entirely to the discussion following each issue that counsel elected to provide.... [However], [a]lthough we find [Appellant's] inclusion of discussion in a Rule 1925(b) statement to be superfluous, we do not consider it a burden upon the trial court such as to preclude its comprehensive analysis of the four issues actually raised." *McGavitt v. Guttman Realty Co.*, 909 A.2d 1, 4 (Pa.Super.2006). As such, we will proceed to an analysis of the merits of the issues raised by Appellant herein.

¶ 18 A challenge to the sufficiency of the evidence is a question of law and thus is subject to plenary review. *Commonwealth v. Jones*, 904 A.2d 24, 26 (Pa.Super.2006). When reviewing a sufficiency challenge, we must determine whether the evidence at trial and all reasonable inferences deducible therefrom, when viewed in the light most favorable to the Commonwealth as verdict-winner, are sufficient to establish all elements of the offense beyond a reasonable doubt. *Id.* "When passing on the credibility of witnesses and the weight of the evidence, the trier of fact is free to believe all, part or none of the evidence." *Commonwealth v. Whitacre*, 878 A.2d 96, 99 (Pa.Super.2005), *appeal denied*, 586 Pa. 750, 892 A.2d 823 (2005) (citation omitted). "We may not weigh the evidence or substitute our judgment for that of the fact-finder." *Commonwealth v. Stevenson*, 894 A.2d 759, 773 (Pa.Super.2006) (citation omitted).

¶ 19 To sustain a conviction for Criminal Conspiracy, the Commonwealth must prove beyond a reasonable doubt that the defendant (1) entered into an agreement to commit or aid in an a criminal act with another person or persons (2) with a shared criminal intent and that (3) an overt act was done in furtherance of the conspiracy. 18 Pa.C.S.A. § 903. *See Commonwealth v. McCall*, 911 A.2d 992, 996 (Pa.Super.2006) (citation omitted). The overt act necessary to establish criminal conspiracy need not be committed by the defendant; it need only be committed by a co-conspirator. *Id.* In addition, our Court has further explained the agreement element of conspiracy as follows:

The essence of a criminal conspiracy is a common understanding, no matter how it came into being, that a particular criminal objective be accomplished. Therefore, a conviction for conspiracy requires proof of the existence of a

shared criminal intent. An explicit or formal agreement to commit crimes can seldom, if ever, be proved and it need not be, for proof of a criminal partnership is almost invariably extracted from the circumstances that attend its activities. Thus, a conspiracy may be inferred where it is demonstrated that the relation, conduct, or circumstance of the parties, and the overt acts of the co-conspirators[,] sufficiently prove the formation of a criminal confederation. The conduct of the parties and the circumstances surrounding their conduct may create a web of evidence linking the accused to the alleged conspiracy beyond a reasonable doubt. Even if the conspirator did not act as a principal in committing the underlying crime, he is still criminally liable for the actions of his co-conspirators in furtherance of the conspiracy.

*Id.* (citation omitted).

¶ 20 Herein, the totality of the evidence taken in a light most favorable to the Commonwealth was sufficient to sustain Appellant's conviction for criminal conspiracy. Each time Officer Gramlich contacted Appellant for the purpose of purchasing drugs, Appellant met Officer Gramlich at a prearranged location, took his order, and obtained the drugs from other individuals positioned nearby. On July 6, 2004, after receiving one bundle of heroin, Officer Gramlich requested more after which Appellant contacted Mr. Wilson and requested "one juan," presumably one bundle of heroin. Appellant then accompanied Officer Gramlich to Mr. Wilson's location a short distance away, after which Appellant and Mr. Wilson engaged in a conversation. Mr. Wilson obtained a bundle of heroin from a nearby car and provided it to Appellant; no money exchanged hands at this time. Appellant then returned to Officer Gramlich who received the bundle in exchange for money. Officer Gramlich watched Appellant commingle the money with his own, return to Mr. Wilson, shake his hand, and provide him with cash. This behavior suggests Mr. Wilson handed Appellant the drugs with the knowledge the latter was going to sell them. Thus, it was appropriate for the trial court to infer an agreement between Appellant and Mr. Wilson to deliver heroin. *See McCall, supra,* (evidence was sufficient to sustain Appellant's conspiracy conviction where he did not physically handle the drugs transacted, but his co-conspirator clearly delivered the illicit drugs in question). Accordingly, we conclude the Commonwealth sufficiently proved all three elements of a criminal conspiracy to sustain Appellant's conviction on that charge.[9]

¶ 21 Appellant next contends the Commonwealth failed to adequately establish the total weight of the heroin involved and reasons that weighing only one packet per bundle is not a sufficient basis upon which to extrapolate the weight of the remaining packets in that bundle. Trial counsel stipulated to the admission into evidence the various seizure analyses in the instant case. The seizure analysis revealed that the total weight of the narcotics in each seizure was calculated by multiplying the weight of the one packet tested in each bundle by the total number of packets in that bundle. The trial court accepted this calculation method and, finding Appellant possessed in excess of one gram of heroin, imposed the mandatory minimum under 18 Pa.C.S.A. § 7508(a)(7).

9. We note that Appellant does not challenge the sufficiency of the evidence for the Posses-sion with Intent to Deliver charge.

¶ 22 Initially, we note that the amount of drugs attributed to Appellant's possession is relevant for purposes of sentencing and does not constitute an element of the offenses of which he was convicted. *See* 35 P.S. § 780–113(a)(30) (the elements of possessing a controlled substance with intent to deliver are possession of a controlled substance and an intent to deliver that substance). Therefore, the Commonwealth was required to prove the quantity of drugs for which Appellant was liable by a preponderance of the evidence, not beyond a reasonable doubt. *See Commonwealth v. Jones,* 413 Pa.Super. 482, 605 A.2d 825, 827 (1992).

¶ 23 "Ordinarily, a challenge to the application of a mandatory minimum sentence is a non-waivable challenge to the legality of the sentence. This is so because, by statute, courts have no authority to avoid imposing the mandatory minimum, assuming certain factual predicates apply." *Commonwealth v. Littlehales,* 915 A.2d 662, 664 (Pa.Super.2007) (citation omitted). Issues relating to the legality of a sentence and a court's application of a statute are questions of law, and our scope of review in such matters is plenary. *Commonwealth v. Bongiorno,* 905 A.2d 998, 1002 (Pa.Super.2006).

¶ 24 "The practice of testing representative samples of larger quantities of drugs and extrapolating therefrom the total narcotic content of illegal substances is well accepted." *Commonwealth v. Minott,* 395 Pa.Super. 552, 577 A.2d 928, 931 (1990) *See also Commonwealth v. Kleinicke,* 895 A.2d 562 (Pa.Super.2006) *(en banc)* (holding the imposition of five year mandatory minimum sentence for possession of fifty-one or more live marijuana plants without unanimity of jurors where fifteen (15) of six hundred ninety-three (693) plants were tested did not violate the appellant's Sixth Amendment right to jury

trial); *Commonwealth v. Jones,* 413 Pa.Super. 482, 605 A.2d 825 (1992); *Commonwealth v. Perez,* 397 Pa.Super. 574, 580 A.2d 781 (1990). While Appellant accepts that *Minott* is the controlling precedent in this issue, he attempts to distinguish that case from the case at bar by arguing that in *Minott,* two packets were weighed from each bundle and that in *Minott,* the total extrapolated weight was significantly more than necessary to satisfy the two gram threshold. Brief for Appellant at 24. We find these arguments to be unconvincing in that neither the number of packets tested nor the total quantity of the narcotics confiscated was determinative therein. Moreover, these circumstances do not change the proclamation this Court made in *Minott* that testing representative samples and extrapolating a total narcotic content is an accepted way of measuring drug quantities. *Id.* at 559, 577 A.2d 928. This Court further stressed the well-established principle in this Commonwealth "that the identity of illegal narcotic substances may be established by circumstantial evidence alone, without any chemical analysis of the seized contraband." *Id.* at 560, 577 A.2d 928 (citations omitted). We explained that:

[s]uch a policy indicates that the courts will not, in cases involving the sale or use of illegal drugs, constrict their fact-finding function in regard to the identity of drugs to a strict scientific analysis, but will rather permit the use of common sense and reasonable inferences in the determination of the identity of such substances. Given this policy of the courts in regard to the identification of illegal drugs as well as the courts' indication of a willingness to utilize the extrapolation method in previous cases, we conclude that the extrapolation method utilized by the court in this case was a reasonable and appropriate one for de-

termining the quantity of illegal drugs seized for sentencing purposes. In so holding, we also note that we would consider a requirement that each of the fifty packets be individually analyzed an onerous and expensive burden and one not necessary for the effective functioning of the judicial sentencing process. *Id.* at 562, 577 A.2d 928.

¶ 25 Furthermore, Appellant acknowledged no precedent exists to refute the *Minott* rule and as such, we agree with the trial court that the Commonwealth carried its burden of proving a total narcotic content by a preponderance of the evidence. The bundles contained packets of substances identically packaged and appearing to be the same substance. As such, the lower court did not abuse its discretion in permitting extrapolation of the quantity of heroin seized from Appellant based upon Officer Gramlich's analysis of one packet from each bundle for purposes of sentencing Appellant.

¶ 26 Appellant next contends the trial court erred in combining the weight of the drugs involved in what he terms to be separate and distinct transactions on June 16, 2004, June 30, 2004, and July 6, 2004, when it determined Appellant trafficked at least one gram but less than five grams of heroin. As the trial court's combining of the amount of drugs confiscated on these three days implicates the mandatory minimum sentencing provisions, this issue relates to the legality of Appellant's sentence. *See Littlehales, supra.*

¶ 27 Under 18 Pa.C.S.A. § 7508(a)(7)(i), an individual who traffics at least one gram (aggregate weight) of heroin must receive a mandatory minimum sentence of three (3) to six (6) years in prison when, if at the time of sentencing, that individual had been convicted of another drug trafficking offense. Herein, the trial court determined Appellant sold approximately 1.5 grams of heroin to Officer Gramlich over the course of three different days, and the total amount of heroin Officer Gramlich seized as a result of his investigation had been approximately 1.9 grams. Trial Court Opinion, 5/26/06, at 6. Though the Bills of Information charged Appellant with one count of Possession with the Intent to Deliver "on or about July 6, 2004," the trial court found Appellant's actions over the three days to be part of "Appellant's overall participation in a narcotics selling enterprise." *Id.* The trial court reasoned that it would have been correct in imposing the mandatory minimum sentence even if Appellant's actions on only July 6, 2004, were considered because in addition the sales Appellant made to Officer Gramlich, he also constructively possessed the 430 milligrams of heroin inside the Buick.

¶ 28 While on the Criminal Complaint it is indicated Appellant had been charged "with violating the Penal Laws of Pennsylvania on or about Tuesday, July 6, 2004," it is also indicated thereon that for the complete text of the acts committed by the accused, one should see the "Supplemental Page." The "Supplemental Page for Complaint" reads as follows:

> At/near 600 W. Girard Ave. [Appellant], in concert with another/others, unlawfully possessed assorted controlled substances, to wit, crack cocaine (PNW: 1.3 grams), Oxycontin (PNW: 3 grams), Heroin (PNW: 2.55 Grams) and Cocaine (PNW: 4 grams), in sufficient quantity and/or under sufficient circumstances as to indicate an intent to deliver and [Appellant] delivered said controlled substances in three separate transactions with one occurring on June 16, 2004, one occurring on June 30, 2004[,] and one occurring on July 6, 2004[,] and [Appellant] unlawfully utilized a cell phone to arrange the three aforesaid deliveries.

¶ 29 In addition, a detailed explanation of the events of June 16, 2004, June 30, 2004, and July 6, 2004, appears in the narrative of the facts of the case.

¶ 30 Our Supreme Court has determined that when drug transactions occurred ten days apart, required separate planning and execution, and were not contingent upon each other, "[t]hey should not be treated as a single criminal act simply because the transactions involved sales to the same undercover officer." *Commonwealth v. Vasquez,* 562 Pa. 120, 123–124, 753 A.2d 807, 809 (2000) (considering whether a conviction within a multiple count complaint should be counted as a prior conviction such that the sentencing enhancement provision of 18 Pa.C.S.A. § 7508 would apply). In light of this conclusion, we find that the heroin Appellant sold on each of the three aforementioned days cannot be properly aggregated for purposes of sentencing. As such, we will consider Appellant's final issue on appeal.

¶ 31 Appellant lastly contends that even if only the drugs dealt on July 6, 2004, are considered, Appellant did not traffic one gram of heroin because he did not jointly constructively possess the drugs inside of Wilson's car. We disagree.

¶ 32 On July 6, 2004, Appellant delivered heroin to Officer Gramlich and immediately thereafter granted the officer's request for more. Also, the trial court found Appellant to be in joint, constructive possession of the heroin found inside the Buick, because both Appellant and Mr. Wilson were engaging in a continuing conspiracy to sell heroin, the contraband found in the vehicle was marked and packaged in an identical manner to that Officer Gramlich purchased, and Mr. Wilson retrieved heroin from his vehicle and transferred it to Appellant to effect the sale. See Trial Court Opinion, 5/26/06, at 6.

¶ 33 Because the drugs recovered from the Buick were not found on appellant's person, he was not in actual possession of them and so the Commonwealth was required to establish that he constructively possessed the contraband. Constructive possession requires proof of the ability to exercise conscious dominion over the substance, the power to control the contraband and the intent to exercise such control. *Commonwealth v. Valette,* 531 Pa. 384, 613 A.2d 548, 550 (1992).

¶ 34 The evidence presented at trial in this case was more than sufficient to establish appellant's constructive possession. First, Officer Gramlich arranged drug purchases on three different days, the last of which Appellant worked with Mr. Wilson to effect the second buy. Also, he was present within and obtained the drugs from the Buick in which a bundle of heroin marked "new era" was later recovered and matched the bundle Appellant sold to Officer Gramlich. Finally, Appellant clearly had the ability to obtain the drugs in the vehicle, as he was present in it and filled an order placed by Officer Gramlich from the quantity contained therein. As such, considering our standard of review, we conclude that the Commonwealth proved constructive possession as the evidence was sufficient to establish appellant's ability to control the heroin obtained from and Buick and his intent to exercise such control. *See Commonwealth v. Petteway,* 847 A.2d 713 (Pa.Super.2004). This quantity of heroin when added to the amounts Officer Gramlich received from Appellant meets the weight requirement for the mandatory minimum sentence required by 18 Pa.C.S.A. § 7508(a)(7).

¶ 35 Judgment of sentence affirmed.

¶ 36 KLEIN, J. FILES A DISSENTING OPINION.

## DISSENTING OPINION BY KLEIN, J.:

¶ 1 While I agree with the majority in most regards, I do not believe the Commonwealth met the burden of proof regarding the total weight of the drugs delivered.[10] Thus, I believe the matter should be remanded for re-sentencing and therefore dissent.

¶ 2 In this matter, Johnson was sentenced to a mandatory term of incarceration pursuant to 18 Pa.C.S. § 7508(a)(7)(i), possession of at least 1.0 gram but less than 5.0 grams of heroin. The Commonwealth sought to prove the weight of the heroin by extrapolating. Three bundles of heroin, each containing multiple packets, were involved in this case. The Commonwealth weighed and tested one packet from each bundle in order to prove the weight.

¶ 3 I do not believe that this represents a proper basis for determining the total weight for sentencing purposes. First, the extrapolated weight is too close to the minimum weight required, 1.0 gram. Second, given the minute amounts involved in this matter, any variance in weight between packets takes on great significance. Third, there was a significant variance in the weight of the measured packets. Fourth, because of one through three, while it would be burdensome upon the Commonwealth to test every packet as to what it contained, it is not burdensome to put 12 or 13 tiny packets on a scale to determine the actual weight of the heroin.

¶ 4 The factual situations, where known, of the cases cited by the majority and the Commonwealth[11] are a far cry from the present situation.

¶ 5 The first thing that must be realized is that we are talking about minute amounts. One gram is the equivalent of .035 ounce. A milligram, the amount used in this case, is 1/1000 of that amount. One of the packets in this case weighed 28 milligrams, that is 28/1000 of a gram or .028 gram. This equates to .00098 ounce. One of the other packets in this case weighed 20 mg. This equates to .020 g or .0007 oz. Even looking at the heaviest of the packets weighed, 54 mg, more than double and almost triple the lightest packet, we must realize that we are speaking of tiny differences. The packet weighing 54 mg, .054 g or .00189 oz, is still only .00119 of an ounce heavier than the .020 g packet.

¶ 6 For comparison and visualization purposes, one extra strength Excedrin tablet contains 250 mg acetaminophen, 250 mg aspirin and 65 mg caffeine for a total of 565 mg. A single tablet of this extra strength over the counter pain reliever is roughly 20 times the weight of the 27 or 28 mg packets of heroin. Imagine a crushed Excedrin tablet (565 mg). Cut the amount in half (280 mg) and then in half again (140 mg) and then in half again (70 mg) and then in half again (35 mg). This is still

---

10. For reference throughout this dissent, there are 5 bundles of heroin referenced in the chemistry lab report in this matter. They are: 1) "Party," 11 packets to the bundle, one packet weighed at 54 mg, delivered on 6/16; 2) "Polo," 13 packets, 20 mg, delivered on 6/30; 3) "Due," 12 packets, 28 mg, delivered on 7/6; 4) "New Era," 13 packets, 27 mg, delivered on 7/6; and 5) "New Era," 12 packets, 36 mg, found in car 7/6.

11. *Commonwealth v. Minott*, 395 Pa.Super. 552, 577 A.2d 928 (1990); *Commonwealth v. Jones*, 413 Pa.Super. 482, 605 A.2d 825 (1992); *Commonwealth v. Perez*, 397 Pa.Super. 574, 580 A.2d 781 (1990); *Commonwealth v. Kleinicke*, 895 A.2d 562 (Pa.Super.2006)(*en banc); Asmer v. State of Florida*, 416 So.2d 485 (1982): and *United States v. Fuentes*, 877 F.2d 895 (11th Cir.1989). All of these cases will be discussed later in this dissent.

more than the amount of the 28 mg heroin packet.

¶ 7 Looking at the numbers involved in this case, certain observations come to mind.

¶ 8 It would seem to be difficult, if not impossible, to believe that a person could visualize the difference between something weighing .028 g and .020 g. Thus any argument that the packet looked the same would be meaningless when talking about the actual weight of the contents.

¶ 9 It would take fewer than 40 .028g packets to total a gram, 50 of the .020 packets to make a gram, but only 20 of the .054 g packet to total a gram. Thus, the differences in weight of the packets involved in this case are demonstrably significant.

¶ 10 Because it is virtually impossible to visually tell the difference between .020, .028 and .036 g, there is no real assurance that weighing a single packet from any one bundle provides an accurate base from which to extrapolate. This is amply demonstrated by realizing that a single packet from each of the bundles stamped "New Era" weighed .027 g and .036 g. One might expect similarly stamped packets to be of similar weight, but that assumption is demonstrably false.

¶ 11 With those observations in mind, I turn to the extrapolation evidence presented in this case.

¶ 12 For extrapolation to be valid, it requires a sound base. This is the basis for the science of statistics. The sample extrapolated from must be representative of the whole. The drugs confiscated on July 6 have a wide variety of weights ranging from 27 mg to 36 mg. This represents a 33% variation in weight. If we look at the weights delivered in June, we are presented with an even greater variation, from 20 mg to 54 mg. Given the wide variation in weights and the fact that it would be visually difficult to discern the minute differences between the contents of the packets, especially from 20 to 28 mg, then I cannot see how taking one packet from each bundle can in any way provide a reliable representative sampling needed for a proper extrapolation.

¶ 13 When we are dealing in such minute quantities, the smallest variance can make a large difference. This is not a situation such as in *Fuentes* where the minimum required weight was 1,000 kg and a weight variance of 50% would still produce triple the required weight. Here, there were 37 packets confiscated on the relevant date and the lightest one measured (but not necessarily the actual lightest packet) was 27 mg. If 27 mg is indeed the average weight of the packets, and we have no reason to actually believe that, then the total weight of the 37 packets was 999 mg, which is 1 tiny milligram shy of the required amount.

¶ 14 Considering the above, I cannot agree that the Commonwealth proved a total weight delivered of a single gram by a fair preponderance of the evidence. There has been no showing that there was a proper base from which to extrapolate.

¶ 15 When dealing with such minute quantities as we are in this matter, it would seem to be no particular trouble to obtain the actual weight of the confiscated substance. Surely the scales of the lab in question can measure the total weight of 11, 12 or 13 packets. When a packet is opened to test the substance within, the empty packet can be weighed and the total weight of the packaging determined and then subtracted from the prior weighing. This appears to me to be the safest and surest method of determining weight for sentencing purposes.

¶ 16 I agree with the majority that under *Commonwealth v. Minott*, 395 Pa.Super. 552, 577 A.2d 928 (1990), and subsequent cases, that in certain circumstances the total weight of a delivery of drugs may be determined through extrapolation. What is at issue here is under the specific circumstances of this case, what qualifies as proper extrapolation. I do not believe that the cases cited by the majority or by the Commonwealth are compelling.

¶ 17 In *Minott*, the Commonwealth seized a single bag of drugs that contained 50 packets of cocaine. The Commonwealth weighed two of the packets and found them to be almost identical—229 milligrams and 230 milligrams.[12] The total weight of the fifty packets was extrapolated to at least 11.4 grams. For sentencing purposes, the relevant amounts were more than 2 grams but less than 100 grams. Even if the chemist managed to randomly pull the two heaviest packets and 48 remaining packets each weighed only 100 milligrams, the 2 gram minimum was easily and obviously reached.

¶ 18 In *Commonwealth v. Jones*, 413 Pa.Super. 482, 605 A.2d 825 (1992), relied upon by the majority, there does not appear to have been any extrapolation.

> At the sentencing hearing on April 12, 1989, the Commonwealth introduced evidence of the precise weight of the cocaine involved: the large bag of cocaine weighted [sic] 19.951 grams, the twenty-four packets in the "Spice Supreme" bottle weighted [sic] 3 .728 grams and the twenty packets weighed 2.722 grams for a total of 26.401 grams of cocaine.

*Id.* at 826. By all appearances, the Commonwealth provided the actual total weight of the group of 24 and 20 packets of cocaine, not an extrapolated total. However, even if the Commonwealth had extrapolated the total weight of the packets, it would not have mattered because the large bag of cocaine was by itself sufficient to reach the relevant statutory minimum weight of 10 grams. Also, given the fact that the Commonwealth apparently actually weighed all the packets, *Jones* supports my belief that it is no burden to the Commonwealth to provide the actual total weight of small amounts of controlled substances.

¶ 19 *Commonwealth v. Perez*, 397 Pa.Super. 574, 580 A.2d 781 (1990), provides no specific guidance at all. That opinion simply notes that two of twenty-two packets were weighed and they extrapolated to 2.21 grams. No specifics were noted as to what each packet weighed. The relevant weights for sentencing in this matter were no less than 2 grams and no more than 10 grams. While *Perez* may be accepted for the proposition that extrapolation is an acceptable method of determining total weight, but the case is of no real use in determining the specifics of extrapolation. I note that the extrapolated weight was 10% greater than the relevant minimum.

¶ 20 *Commonwealth v. Kleinicke*, 895 A.2d 562 (Pa.Super.2006) *(en banc)*, dealt with the number of marijuana plants involved, not the total weight of the drugs involved. As such, I do not believe that *Kleinicke* has any particular relevance to the present question.

¶ 21 The Commonwealth has cited *Asmer v. State of Florida*, 416 So.2d 485 (1982), for the proposition that a measurement of one of many items may suffice for extrapolation purposes. In *Asmer*, the drug involved was methaqualone, more commonly known as Quaalude, and the

---

12. For further reference throughout this dissent, 1 milligram (mg) is 1/1000 of a gram (.001 g). One gram is equivalent to .035 ounce. One milligram is the equivalent of .000035 oz. Going the other way, there are 28.3 grams per ounce.

drug came in pill form. The State weighed only one of 1,000 pills and extrapolated the net weight to 795.7 grams. The relevant weights in *Asmer* were not less than 200 grams and not more than 5 kilograms. I note that pills are generally standardized in size and weight. Once again, even if the single measurement had been off by a half, the total weight would have been more than double the required minimum.

¶ 22 Finally, the Commonwealth cites *United States v. Fuentes,* 877 F.2d 895 (11th Cir.1989), that allowed for extrapolation where the government weighed one of 250 bales to show that the defendant had possessed at least 1,000 kilograms of marijuana.[13] The total weight extrapolated to almost 7,000 kilos, well in excess of the 1,000 kilo minimum, even allowing for variations in bale weight. Even if each of the other bales weighed only 13 kilograms, less than half the weighed bale, the total weight would still be over 3,200 kilos.

¶ 23 What is particularly notable about these cases is that even accepting a certain margin of error, the relevant minimum weights were all obviously reached. In some of the cases, *Fuentes* and *Minott,* the weight used to extrapolate the total could have been off by at least double and the required minimum would still have been met. In *Asmer,* the extrapolated weight was more than 3 times the required minimum.

¶ 24 However, I realize that the law allows for extrapolation. If extrapolation is to be used in circumstances such as this, the Commonwealth still needs to take care to make sure that basis for extrapolation is sound. A single packet from a bundle, where minute variations are undetectable to the naked eye and those variations can have a significant impact on the ultimate determination, is not a sound basis for extrapolation. It is guesswork.

¶ 25 I would initially propose that in any situation where a mandatory minimum sentence is based upon a minimum weight of 1.0 to 2.0 grams,[14] the Commonwealth should simply weigh the amount seized and provide the actual weight. If, however, extrapolation is to be used, then a common sense approach is required. In this matter, weighing three packets from each bundle would likely produce a sufficient basis for extrapolation, especially if the three packets produced similar weights. However, if one of those packets weighed 28 mg, another 24 mg and another 15 mg, then common sense would indicate that we must weigh more packets to obtain a proper base line.

¶ 26 This would not represent a significant change to current procedures. In a matter such as *Fuentes,* a bale of marijuana will very likely look like any other bale of marijuana and if the difference between weights of the bales is even five kilograms, the fact that there are 250 such bales renders the individual weight differences less important. This is especially true where the minimum weight required for sentences purposes will be easily met due to the number of bales.

¶ 27 If, however, the bale weighed 20 kg and there were 50 such bales, then weighing more bales would be necessary because any variation in weight takes on greater

---

**13.** An odd typographical error has followed this case through Pennsylvania case law. *Fuentes* indicates that the single bale weighed 27.65 kilograms (roughly 60 pounds). However, *Minott* cites the weight as 27.65 grams (roughly .06 pound). This typographical error has followed the *Fuentes* case through our case law, including the Commonwealth's brief. One could hardly call 27.65 grams of marijuana a bale.

**14.** 18 Pa.C.S. § 7508(2)(i), (3)(i), and (7)(i)

significance. This is simple common sense. I note my belief that if the single imaginary bale in this scenario weighed 19 kg, then the Commonwealth would have no trouble whatsoever weighing a few more bales in an effort to show the 1,000 kg minimum had been met. The Commonwealth, in that situation, would want to make sure that it had a proper basis from which to extrapolate, as well it should. The 19 kg bale may well be slightly lower than the actual average weight. It may also be slightly heavier than the actual average weight of the bales. Either way, it is proper, important and necessary to have the correct information.

¶ 28 The point of this is not to punish the Commonwealth or reward a defendant through a technicality. The point is simply to provide a proper and sound basis for sentencing. In some instances obtaining a proper basis for extrapolation might benefit a defendant, but this does not represent an unfair or improper benefit any more than it would represent an unfair benefit to the Commonwealth in another instance.

¶ 29 For the foregoing reasons I do not believe that the Commonwealth met its burden of proof regarding the total weight of the drugs delivered. Therefore, I dissent and I would reverse and remand on this issue for resentencing.