IN THE SUPREME COURT OF PENNSYLVANIA
EASTERN DISTRICT

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, JJ.**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | No. 682 CAP |
| Appellee | Appeal from the Judgment of Sentence entered on December 12, 2012 in the Court of Common Pleas, Chester County, Criminal Division at Nos. CP-15-CR-0002897-2009 and CP-15-CR-0004895-2008. Post Sentence Motions denied by operation of law on 05/30/2013 (see order entered on 06/18/2013 in CCP) |
| v. | |
| LAQUANTA CHAPMAN, | |
| Appellant | ARGUED: September 10, 2015 RESUBMITTED: January 20, 2016 |

***OPINION***

**MR. CHIEF JUSTICE SAYLOR**                    **DECIDED: March 29, 2016**

This is a capital direct appeal.

On October 30, 2008, Appellant shot and killed his sixteen-year-old neighbor, Aaron Turner, in the basement of Appellant's residence. Subsequently, with the assistance of his younger cousin, Bryan Bird, Appellant dismembered the victim's body and disposed of the remains in the trash.

Weeks later, law enforcement officers investigating the sale of illicit drugs from Appellant's premises obtained a warrant to search them for evidence of drug activity. In the course of the ensuing search, police discovered an abundance of residual, physical evidence from the killing and dismemberment. Appellant was arrested and charged

with murder and other crimes, and the Commonwealth tendered notice of an intention to pursue the death penalty.

At Appellant's trial before a jury, the defense admitted that Appellant had perpetrated most of the crimes with which he was charged (other than murder). *See, e.g.*, N.T., Nov. 1, 2012, at 52-53; N.T., Nov. 8, 2012, at 98. In line with these concessions, the defense acknowledged that the victim had been killed in the basement of Appellant's residence, *see, e.g.*, N.T., Nov. 1, 2012, at 149, and that Appellant "was involved in cleaning up the crime scene." N.T., Nov. 8, 2012, at 98. The defense contended, however, that there was reasonable doubt concerning the identity of the shooter and attempted to shift the blame to Bryan Bird.

The jury nonetheless convicted Appellant of first-degree murder and other offenses and returned a death verdict in a separate penalty proceeding. Post-sentence motions were filed and denied, and this direct appeal followed.

**Guilt Phase**

Although Appellant does not challenge the sufficiency of the evidence supporting his first-degree murder conviction, this Court automatically undertakes such review in capital direct appeals.

In the present case, the only element of first-degree murder ever in question pertained to identity, since the deliberate, malicious killing and subsequent dismemberment of Aaron Turner were amply established by physical evidence.[1] The

---

[1] *See, e.g.*, N.T., Nov. 2, 2012, at 11-29 (reflecting the testimony of a crime scene investigator that various blood-stained items of Appellant's clothing were found in a garbage bag in Appellant's residence, together with a .25 caliber shell casing); N.T., Nov. 7, 2012, at 192-200 (reflecting the attestation of a DNA expert to a very high probability that human tissue and blood found in the basement of Appellant's residence and on clothing in garbage bags on the first floor were the victim's).

Commonwealth presented testimony from Bryan Bird that he was an eyewitness to Appellant's perpetration of the killing, *see, e.g.*, N.T., Nov. 5, 2012, at 36, and an inmate testified that, while in jail awaiting trial, Appellant confessed to having killed the victim. *See* N.T., Nov. 7, 2012, at 100-107. Such evidence, in and of itself, was plainly sufficient to support the jury's determination. Moreover, the Commonwealth presented a wealth of corroborating circumstantial evidence, including Appellant's attempts to destroy evidence and lies to police during their investigation,[2] evidencing his consciousness of his guilt.

In his first guilt-phase claim for relief, Appellant asserts that the common pleas court erred when it denied a pretrial motion seeking to suppress evidence taken from his residence. Appellant styles this claim as follows: "Search of House Impermissible as Beyond the Breadth of a Search Warrant Describing Criminal Conduct *in a Detached Garage*." Brief for Appellant at 18 (emphasis adjusted). Consistent with this framing, Appellant's argument assumes that the affidavit of probable cause supporting the initial warrant described criminal conduct only in the garage. *See, e.g.*, *id.* (depicting the underlying circumstances as involving "[a] search warrant issued 10/22/2008, describing criminal conduct (drug sales) from a garage building detached from a home"); *id.* at 19 (suggesting that "the search warrant affidavit (controlled drug buys from garage) did not describe conduct in the house"). While indicating that it is permissible to extend an authorized search of a residence to the curtilage, Appellant contends that such an approach should not operate in the reverse, particularly given the decisions of this Court

---

[2] Again, the evidence presented by the prosecution on both points was so strong that the defense conceded them. *See, e.g.*, N.T., Nov. 8, 2012, at 98 (reflecting defense counsel's concession, in his closing remarks to the jurors, that Appellant was "involved in cleaning up the crime scene"); *id.* at 104 (reflecting defense counsel's assertion before the jury that Appellant "is one of the worst liars I've ever seen in my life").

allocating to residences the strongest protection from unreasonable searches. *See, e.g., Commonwealth v. Brion*, 539 Pa. 256, 257, 652 A.2d 287, 287 (1994) (characterizing the right to privacy in one's domain as "sacrosanct"). Appellant also suggests that a particular description of the place to be searched, in terms of the residence, was lacking in the relevant search warrant. *See* Brief for Appellant at 19.

A primary flaw in this argument is that it is materially misleading. Initially, the search warrant under review expressly identified the premises to be searched as follows:

> *35 Chester Avenue is described as a single family dwelling, twin with white siding and yellow door/shutters.*
>
> Detached garage is located to the rear of the residence having white shingles.

Application for Search Warrant and Authorization at 1 (emphasis added). Thus, the residence was very plainly encompassed within the warrant.

Moreover, although Appellant is correct that the affidavit of probable cause describes controlled drug purchases occurring in the garage, the affiants also specifically sought permission to search the residence based, *inter alia*, upon attestations that: the affiants had particularized knowledge and experience with drug trafficking; "it is common for larger-scale narcotic traffickers to secrete contraband, proceeds of narcotics sales, and records of drug transactions in secure locations within their residences"; "narcotics traffickers commonly have in their possession, that is on their person, at their residence and/or their businesses, firearms"; and "three individual sources . . . relayed that over the past month the foot traffic and suspected drug activity which had been taking place from the garage . . . has moved to the rear door of the residence which is where all of the activity is now taking place." *Id.* at 3, 5, 8 (affidavit of

probable cause). Upon consideration of this and other information within the four corners of the affidavit of probable cause, the attesting officers indicated:

> [B]ased on your affiants' experience and training, and the facts described herein, it is you affiants' opinion that there is ongoing drug trafficking taking place *inside the residence listed above.* Your Affiants believe that there is a fair likelihood that [the] *aforementioned residence* will contain those items listed in the section titled Items to be searched for and seized within this document.

*Id.* at 8 (emphasis added).

Judicial review concerning whether a search warrant is supported by probable cause is generally accomplished via a close review of the affidavit, *see Commonwealth v. Coleman,* 574 Pa. 261, 271, 830 A.2d 554, 560 (2003), and certainly, there is a wealth of precedent governing such review as it concerns information received from unidentified persons and confidential informants. *See, e.g., Commonwealth v. Luv,* 557 Pa. 570, 576, 735 A.2d 87, 90 (1999) ("A determination of probable cause based upon information received from a confidential informant depends upon the informant's reliability and basis of knowledge viewed in a common sense, non-technical manner."). Appellant's presentation, however, does not implicate an examination of this line of precedent, since he offers no argumentation assailing the quality or veracity of the information collected by the affiants.

In summary, Appellant's position that the search warrant was directed only to the garage and described only criminal conduct in such location is facially meritless.

Next, Appellant complains that his constitutionally protected refusal to voluntarily surrender a DNA sample to investigators was wrongfully used against him at trial.

By way of background, in his examination of a detective at trial, the prosecutor elicited a statement that Bryan Bird and another suspect had voluntarily provided DNA samples to police but that Appellant had refused to do so. *See* N.T., Nov. 5, 2012, at

123.  Appellant's counsel advanced a general objection, and the trial court, acting *sua sponte*, cautioned the jurors as follows:

> Ladies and gentlemen, the defendant is required to provide no evidence whatsoever in this matter.  And I instructed you earlier on the presumption of innocence.  And I instructed you about the obligation of the defense to provide no evidence, only if it deems appropriate to do so.
>
> And the fact that any requests were made of [Appellant] to do anything in this matter is completely irrelevant.  He is under no obligation to provide any evidence, either during the course of the trial or during the course of the investigation.

*Id.* at 123-124.

Despite this instruction, the defense then moved for a mistrial on the basis that the refusal was "clearly an assertion of the right to silence."  *Id.* at 124.  The court denied this motion but, anticipating that the prosecution intended to display to the jury a videotape of the police interview with Appellant, directed the prosecutor to redact references to Appellant's refusal to furnish a DNA sample.  *See id.* at 125.  Although the tape was redacted to remove some references to such refusal, apparently one was missed, *see id.* at 135-36, which proceeded as follows:

> [Detective]:    And you're telling me I should check everybody's DNA but I can't even get your DNA.  You understand like how I'm supposed to check everybody's?
>
> [Appellant]:  No I'm saying like.
>
> [Detective]:  You want me to eliminate you from stuff.
>
> [Appellant]:  Yeah.
>
> [Detective]:  Well.

[Another Detective]: You want me to check DNA on other people that stay in the house but the person that owns the house . . ..

*Id.*, Ex. C-37 at 153.

The defense again moved for a mistrial, *see id.* at 135, and the trial court denied that motion as well, *see id.* at 137-38. Instead, the court offered to repeat its cautionary instruction, which the defense refused. *See id.* Later, however, in its opinion under Rule of Appellate Procedure 1925(a), the court took the position that Appellant's challenge was a "red herring," since references to Appellant's refusal were admissible into evidence given that the statement was voluntarily made. *Commonwealth v. Chapman*, Nos. 2897-2009, 4895-2008, *slip op.* at 3-4 (C.P. Chester Mar. 9, 2015).[3]

Presently, Appellant maintains that his Fifth Amendment right against self-incrimination was violated. *See, e.g*, Brief for Appellant at 26 ("[A]ppellant here asserts that spotlighting the choice not to submit DNA ought to be treated just like any traditional self-incrimination protection.")*.* Appellant also offers a general allusion to due process. *See id.* ("It is constitutionally impermissible to make any suggestion or ask for any inference as the prosecutors here did, and the learned trial judge who permitted it to ripen into a death sentence violated appellant's rights under the 14th Amendment right to [d]ue process in doing so."). In response, the Commonwealth asserts, *inter alia*, that Appellant's right against self-incrimination was never in issue, since DNA evidence is nontestimonial in nature. *Cf. Schmerber v. California*, 384 U.S. 757, 765, 86 S. Ct. 1826, 1832-33 (1966) (holding that evidence garnered from a blood test is not protected

---

[3] The trial court deemed the objection to have been waived in the absence of any reference to the playing of Appellant's statement. We decline to enforce a blanket waiver relative to this claim, however, where Appellant objected to references to his refusal; the court directed that the videotape of his interview should be redacted to exclude such references; and Appellant objected promptly to a missed reference after the tape was played.

by the Fifth Amendment because it is "neither [] testimony nor evidence relating to some communicative act or writing").

Although Appellant's focus on the Fifth Amendment may be misplaced, we find that the circumstances presented implicate a broader due process concern. In this regard, the admission of evidence of a refusal to consent to a warrantless search to demonstrate consciousness of guilt is problematic, as most jurisdictions hold (outside the context of implied-consent scenarios) that such admission unacceptably burdens an accused's right to refuse consent.[4]

Nevertheless, we find that the reference to Appellant's refusal was harmless as it was not highlighted to the jury by the prosecutor; the trial court had issued an appropriate cautionary instruction and offered to repeat it; and Appellant's consciousness of guilt relative to his many crimes was manifest in any event by virtue of his admitted conduct in destroying evidence and lying pervasively to police. *See, e.g.*, *supra* note 2. Upon our review of the record as a whole, which presents strong direct and circumstantial evidence of Appellant's guilt, we conclude that the reference simply

---

[4] *See, e.g.*, *United States v. Runyan*, 290 F.3d 223, 249 (5th Cir. 2002) ("[T]he circuit courts that have directly addressed this question have unanimously held that a defendant's refusal to consent to a warrantless search may not be presented as evidence of guilt."); *State v. Jones,* 753 N.W.2d 677, 687 (Minn. 2008) ("It is a violation of the defendant's right to due process for a prosecutor to comment on a defendant's failure to consent to a warrantless search."); *Bargas v. State,* 489 P.2d 130, 132 (Alaska 1971) ("It would make meaningless the constitutional protection against unreasonable searches and seizures if the exercise of that right were allowed to become a badge of guilt."); *accord Commonwealth v. Tillery*, 417 Pa. Super. 26, 35, 611 A.2d 1245, 1250 (1992) (citing *Commonwealth v. Welch*, 401 Pa. Super. 393, 398, 585 A.2d 517, 520 (1991)).

As an aside, such treatment contrasts with the response in scenarios in which a defendant resists providing a sample during the execution of a duly authorized search warrant. *See, e.g.*, *United States v. Ashburn*, 76 F. Supp. 3d 401, 444-46 (E.D.N.Y. 2014).

did not make a difference in the verdict. *See generally Commonwealth v. Story*, 476 Pa. 391, 409, 383 A.2d 155, 164 (1978) (setting forth the standard governing harmless-error review).

**Penalty Phase**

Appellant presents several claims of trial court error at the penalty stage. Our review, however, centers upon the one which we find to be dispositive of the outcome of this appeal.

Appellant argues that the evidence offered by the Commonwealth in support of the sole aggravating circumstances pursued by the prosecution and found by the jury was insufficient.[5] Appellant explains that the Commonwealth proceeded to a penalty hearing exclusively on the basis that Appellant had "a significant history of *felony* convictions involving the use or threat of violence to the person." 42 Pa.C.S. §9711(d)(9) (emphasis added). To support this aggravator, the prosecution adduced evidence that Appellant was convicted, in New Jersey, of two instances of aggravated assault as such offense is defined and administered in that state. *See* N.J. Stat. Ann. §2C:12-1(b)(3), (4). Appellant observes, however, that New Jersey does not denominate violations of its criminal statutes as "felonies," but, rather, employs a grading scheme ranging from "a crime of the first degree" to "a crime of the fourth degree." *See, e.g., id.* §2C:43-6. Further, Appellant highlights that his convictions entailed the least of these denominations, fourth degree crimes, which carry a maximum sentence of up to eighteen months. *See id.* §§2C:12-1(b)(4), 2C:43-6(a)(4). It is

---

[5] This claim was preserved, even in the absence of a specific objection during the penalty phase, upon the common pleas court's denial of a pretrial motion to quash the aggravator. *See* Pa.R.E. 103(b). In any event, the defense renewed the objection in the sentencing proceedings. *See* N.T., Nov. 13, 2012, at 2.

Appellant's core position that the New Jersey crimes cannot be considered felonies for purpose of the (d)(9) aggravator.

During the penalty phase, the trial court recognized that, based on the sentencing structure, Appellant's New Jersey crimes simply were not felonies in Pennsylvania. *See* N.T., Nov. 13, 2012, at 10. Nevertheless, the court suggested that it might proceed under an equivalency test based on conduct. According to the court:

> It would be conduct, not penalty. Because otherwise, you would allow the New Jersey legislature to regulate the equivalent grading in Pennsylvania based upon that legislature's determination of what the appropriate penalty might be instead of Pennsylvania statute, instead of the Pennsylvania legislature.

*Id.* Subsequently, however, the court implemented a previous ruling that felony status, for purposes of the relevant aggravator, should be adjudged according to whether a crime was a common-law felony. *See id.* at 23-24.

In response to Appellant's arguments, the Commonwealth relies substantially upon a footnote in *Commonwealth v. Maxwell*, 534 Pa. 23, 626 A.2d 499 (1993), in which the Court pronounced, rather cryptically, that "[a] felony is a felony no matter where it is committed." *Id.* at 27 n.4, 626 A.2d at 501 n.4. While the Commonwealth concedes that New Jersey does not use the term "felony" in classifying crimes, it maintains that "the crime[s] of which the defendant was convicted of in New Jersey have been considered felonies by courts in various contexts." Brief for Appellee at 45. In this regard, the Commonwealth references *Zaborowski v. PSP*, 892 A.2d 68 (Pa. Cmwlth. 2006), in which the Commonwealth Court found no error in the State Police's classification of several New Jersey crime convictions as felony convictions for purposes of the Pennsylvania Uniform Firearms Act of 1995, 18 Pa.C.S. §§ 6101-6127. *Zaborowski*, 892 A.2d at 72-74. Finally, the Commonwealth endorses the trial court's

rationale adopting a common-law litmus for felonies, for purposes of the (d)(9) aggravator.

The issue of statutory construction before the Court presents a question of law over which our review is plenary.

In *Commonwealth v. Robinson*, 583 Pa. 358, 877 A.2d 433 (2005), this Court determined, for purposes of the aggravating circumstance set forth at Section 9711(d)(6) -- pertaining where a defendant has committed a killing while in perpetration of a felony -- that the definition of "felony" should be taken from the Crimes Code. *See id.* at 379-81, 877 A.2d at 445-46 (relying upon *Commonwealth v. Walker*, 540 Pa. 80, 102-03, 656 A.2d 90, 101 (1995)).[6]

As clarified in the Joint State Government Commission's Comment, Section 106 of the Crimes Code delineates that offenses that are not specifically denominated felonies or misdemeanors in the Crimes Code, but which carry maximum sentences of five years or less, are classified as misdemeanors; whereas, crimes not specifically denominated felonies or misdemeanors in the Crimes Code, but which carry maximum sentences of more than five years, are classified as felonies. *See* 18 Pa.C.S. §106(b) (4), (6), Joint St. Gov't Comm'n Comment. Furthermore, the statute specifies that "[a]ny offense declared by law to constitute a crime, without specification of the class thereof, is a misdemeanor of the second degree, if the maximum sentence does not make it a

---

[6] In responsive opinions, this author, Justice Baer, and former Justice Nigro advanced the position that the (d)(6) aggravator should be limited to six major felonies that are specifically enumerated in a statutory definition of "perpetration of a felony," which is presently reposited in the section of the Crimes Code addressing the substantive crime of murder, 18 Pa.C.S. §2502(d). *See Robinson*, 583 Pa. at 392-99, 877 A.2d at 453-58 (Saylor, J., concurring and dissenting, joined in relevant part by Nigro, J.); *id.* at 387, 877 A.2d at 450 (Baer, J., concurring and dissenting). That position, however, did not command a majority.

felony under this section." *Id.* §106(d). Finally, Section 106 also provides that "[a]n offense hereafter defined by any statute other than this title shall be classified as provided in this section." *Id.* §106(e).

Regardless of what was said in *Maxwell*'s cryptic footnote, the Pennsylvania Legislature has generally established a bright-line division between felonies and misdemeanors, in the absence of a specific designation within the Crimes Code, hinging on the permissibility of a term of incarceration greater than five years. This Court's *Robinson* decision expressly requires application of this test in the assessment of the in-perpetration-of-a-felony aggravator, and we can discern no reason why the concept of "felony" should be different as applied to the (d)(9) aggravating circumstance.

Moreover, this Court is obliged to maintain a narrowing construction relative to imposition of capital punishment. *See, e.g.*, *Zant v. Stephens,* 462 U.S. 862, 877, 103 S. Ct. 2733, 2742 (1983) (holding that, to satisfy the constitutional standard derived from *Furman v. Georgia*, 408 U.S. 238, 92 S. Ct. 2726 (1972)*,* an aggravating circumstance "must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant as compared to others found guilty of murder"). Along these lines, we simply do not believe that the Legislature intended for the five-year litmus to apply to offenses committed in Pennsylvania, but to disparately implement some looser, common-law construct pertaining to crimes committed in other states. Furthermore, the conduct-based equivalency regime alluded to by the trial court also would generate factual issues which would need to be resolved by jurors, not judges. We find no indication, on

the face of the statute, that the General Assembly intended such a fact-driven inquiry to be undertaken.[7]

The New Jersey crimes of which Appellant was convicted -- per which the sentencing court was authorized to impose, at most, eighteen-month maximum terms -- plainly do not qualify as felonies under Section 106 of the Pennsylvania Crimes Code. We conclude, therefore, that they could not serve as the essential predicate for the (d)(9) aggravator, which turns upon a finding of a significant history of violent *felony* convictions.  *See* 42 Pa.C.S. §9711(d)(9).

Given that the (d)(9) aggravator was the sole aggravating circumstance presented to the jury, we are required to remand for imposition of a life sentence.  *See* 42 Pa.C.S. §9711(h)(4) ("If the Supreme Court determines that the death penalty must be vacated because none of the aggravating circumstances are supported by sufficient evidence, then it shall remand for the imposition of a life imprisonment sentence.").[8]

---

[7] We believe that the common pleas court's reservation about other state legislatures determining felony status when implementing their own policy-based judgments concerning penalties is of lesser concern than application of a disparate common-law or equivalency construct pertaining to out-of-state offenses.  Moreover, and again, at least after rejection of the minority position in *Robinson* that the perpetration-of-a-felony aggravator was subject to a discrete statutory formulation, *see supra* note 6, we discern no evidence that the General Assembly intended for different conceptions of the term "felony" to apply as between Sections 9711(d)(6) and (d)(9).

[8] In some recent decisions, this Court has transferred death-penalty appeals to the Superior Court, which administers as-of-right direct appellate review in non-capital cases, when it has become clear in our own review that a death sentence is unavailable.  *See, e.g.*, *Commonwealth v. Gibson*, 592 Pa. 411, 418, 925 A.2d 167, 171 (2007).  Here, however, the guilt-phase review is not burdensome and was complete as of the time it became clear that imposition of a life sentence was required.  Therefore, and to promote efficiency, we have completed the guilt-phase review, above.

The judgment of sentence of death is reversed, and the case is remanded to the common pleas court to effectuate the imposition of a life sentence. Jurisdiction is relinquished.

Justices Baer, Todd, Donohue, Dougherty and Wecht join the opinion.