J-S34040-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| LELIA ADAMS A/K/A LELIA SABRKESH | |
| Appellant | No. 1459 MDA 2015 |

Appeal from the Judgment of Sentence April 17, 2015
In the Court of Common Pleas of York County
Criminal Division at No(s): CP-67-CR-0007513-2012

BEFORE: PANELLA, J., STABILE, J., and JENKINS, J.

MEMORANDUM BY JENKINS, J.:                          **FILED MAY 24, 2016**

Leila Adams appeals from her judgment of sentence of 24 months' probation for conspiracy[1] to commit possession with intent to deliver a controlled substance (cocaine)[2] and conspiracy to commit intentional possession of a controlled substance by a person not registered.[3] We affirm.

Procedurally, this case is unremarkable. On June 18, 2012, Adams was arrested and charged with the above offenses along with endangering the welfare of children ("EWOC"). The Commonwealth subsequently withdrew the EWOC charge. Adams' arrest resulted from the discovery of

_____

[1] 18 Pa.C.S. § 903(a)(1).

[2] 35 P.S. § 780-113(a)(30).

[3] 35 P.S. § 780-113(a)(16).

crack cocaine, drug paraphernalia, guns, ammunition and other drug-related evidence in the master bedroom of a house that she shared with her husband, Daniel Adams ("Husband").

Adams moved to suppress all evidence obtained from the execution of the search warrant, but the trial court denied the motion to suppress. Subsequently, a jury acquitted Adams of possession of a controlled substance and possession with intent to deliver a controlled substance but convicted her on both conspiracy counts. The court sentenced Adams to the aforementioned term of probation. Adams filed a timely post-sentence motion, which the court denied, and a timely notice of appeal. Both Adams and the trial court complied with Pa.R.Crim.P. 1925.

Adams raises two issues on appeal:

1. Did the trial court err when it denied [Adams'] pre-trial motion to suppress evidence because the warrant was approved without the requisite probable cause?

2. Did the trial court err in denying [Adams'] motion for judgment of acquittal because the Commonwealth's evidence was insufficient as a matter of law to prove a conspiracy?

Brief For Appellant, at 6.

In her first argument, Adams asserts that the trial court should have suppressed the evidence seized from her residence pursuant to the search warrant, because the affidavit underlying the warrant did not furnish probable cause that the police would find evidence of criminal activity at Adams' residence. More specifically, Adams insists that the sources for the

information in the affidavit were two children, aged 11 and 12, who were neither competent nor reliable.

Our review is limited to determining whether the record supports the findings of fact of the suppression court and whether the legal conclusions drawn from those findings are correct. *Commonwealth v. Mistler*, 912 A.2d 1265, 1268 (Pa.2006). When the defendant appeals an adverse suppression ruling, we may consider only the evidence presented for the Commonwealth and that of the defense which remains uncontradicted when fairly read in the context of the entire record. *Commonwealth v. Pruitt*, 951 A.2d 307, 317 (Pa.2008). We are bound by the factual findings of the suppression court which are supported by the record, but we are not bound by the suppression court's legal rulings, which we review *de novo*. *Commonwealth v. Snyder*, 963 A.2d 396, 400 (Pa.2009).

In this case, on June 7, 2012, Officer Adam Bruckhart of the West Manchester Township Police Department submitted an application for a warrant to search the premises at 2155 Carriage Run Road in West Manchester Township. Officer Bruckhart averred:

(RM) reported that his 6th grade West York Area Middle School classmate … (AB), ha[d] been bragging that her father makes $5,000 per week as a tow truck driver. (RM) stated that, he and his classmate friend, DT[,] refused to believe (AB).

(RM) stated that on 06/05/12, between 1530 and 1600 hrs, he and (DT) went to (AB's) residence at 2155 Carriage Run Rd, West Manchester Twp. (AB) then took them upstairs where she showed them a bedroom door that has a metal locking mechanism over the door handle. (AB) told them that she knew

where her parents kept the key and soon returned with it. Once inside the bedroom, (AB) opened a drawer and showed the contents to (RM) and (DT). (RM) said there was a sandwich bag twisted closed at the top which was filled with small white rocks. (RM) stated that he and (DT) believed that the substance they saw in the bedroom of 2155 Carriage Run Rd. may have been cocaine. In furtherance of this, they searched for information and photographs of cocaine through the internet search engine, Google. Based upon what they saw on the internet, they came to the conclusion that the substance (the sandwich bags containing white rocks) which they observed in the bedroom at 2155 Carriage Run Rd., was cocaine. (AB) reportedly told (RM) that the rocks were her dad's clay. (RM) said that he also saw a bunch of currency and that all of the bills looked like $100 bills. (AB) then showed (RM) and (DT) a gun. (RM) described the gun as a semi-automatic pistol. (RM) also said that he saw a magazine for the gun that was loaded with ammunition.

On 06/06/12, I asked (RM) and his parent to meet with me for an additional interview. During this interview, (RM) confirmed to me the previous report and provided additional information. (RM) stated that within the last month (AB) has taken him, and (DT), into her parents' bedroom 4 or 5 times. This is where (AB's) parents hide the snack food and soda. On three occasions[,] (AB) has opened drawers and showed (RM) and (DT) large sums of cash in $100 and $50 denominations, as well as bags of what (AB) stated was her dad's 'clay'. On two occasions, (AB) has shown (RM) and (DT) her dad's handguns (one in a dresser drawer and four in the closet). On one occasion, (AB) handled several of the guns.

(RM) stated that on 06/05/12 between 1530 and 1600 hrs., (AB) again took him and (DT) to her parents' bedroom located on the 2nd floor of 2155 Carriage Run Rd. (RM) stated that the bedroom is located on the left at the top of the stairs. There is a metal lock over the door knob and the key is located in a shoe which is in a closet at the top of the steps. (RM) stated that (AB) went over to a night stand, located on the left side of the bed, and opened the top drawer. This drawer contained a shoe box, which was completely filled with $100 and $50 bills, which were separated by rubber bands. The bills were stacked on their sides and occupied the entire length of the box. Behind the box was a sandwich bag filled with approx[imately] five white/yellowish rocks slightly larger than golf balls. (RM) stated

that (DT) touched the bag and determined that the rocks were hard and were not clay. (AB) then opened the bottom drawer which contained a grey colored semiautomatic handgun and a magazine loaded with ammunition.

(RM) stated that he is familiar with, and has handled/fired semi-automatic handguns with his father a number of times in the past. (RM) described the firearm in detail and was able to confirm the description he provided after being shown a semi-automatic handgun similar to the one he described. (RM) stated that after (DT) touched the crack and confirmed that it was not clay, he was able to view a picture of crack cocaine online which looked exactly what he had seen in (AB's) father's drawer. (RM) brought a picture of crack to our PD. I then showed (RM) various pictures of controlled substances, including approx[imately] 10 pictures of crack. (RM) was able to pick out crack cocaine and stated that the substance that he saw looked most similar to the photos of crack cocaine shown in the 2011 Drug Identification Bible on page 563 (top left & 3rd down on left) and page 564 (top left). (RM) stated at least five times that he was absolutely sure that the bag in (AB)'s father's drawer contained crack cocaine.

The affidavit continued that Officer Bruckhart contacted DT, who came to the police station with his parent for an interview. DT's account

matched (RM)'s account, with very few exceptions.

(DT) stated that within the last 5-6 weeks[,] (AB) has taken him and (RM) into her parents' bedroom a number of times. On four occasions[,] (AB) has opened drawers and showed (DT) and (RM) large sums of cash, in $100 and $50 denominations, and bags of what (AB) stated was her dad's 'clay'. On four occasions, (AB) has shown (DT) and (RM) her dad's handguns (one in a dresser drawer and five in the closet). On one occasion[], (AB) handled several of the guns in the presence of (DT) and (RM). (DT) stated that on 06/05/12 [at] around 1600 hrs., (AB) again took him and (RM) to her parent[s'] bedroom located on the 2nd floor of 2155 Carriage Run Rd. (DT) stated that the bedroom is located on the left at the top of the stairs. There is a metal lock over the door knob[,] and the key is located in a shoe which is in a closet at the top of the steps. (DT) stated that on 06/05/12, (AB) did not need a key[,] because she learned that the door does not latch properly and the door will open when sufficient

pressure is applied to the outside of the door. (DT) stated that (AB) went over to a night stand located on the left side of the bed and opened the top drawer. The drawer contained a shoe box, which was completely filled with $100 and $50 bills. These bills were separated by rubber bands, were stacked on their side, and occupied the entire length of the box. Behind the box was a sandwich bag filled with approximately seven yellowish rocks slightly larger than 50 cent piece[s]. (DT) stated that he touched the bag and determined that the rocks were hard and that they were not clay. (AB) then opened the bottom drawer which contained a semi-automatic handgun and a black colored magazine loaded with ammunition.

(DT) stated that when he touched the white/yellowish substance and confirmed that it was not clay, he then ran out of the house, went home, and viewed pictures of crack cocaine online. (DT) stated that the pictures were exactly what he had seen in (AB)'s father's drawer. I then showed (DT) various pictures of controlled substances, including approximately 10 pictures of crack cocaine. (RM) was able to pick out crack cocaine and stated that the substance that he saw look most similar to the photos of crack cocaine shown to him in the 2011 Drug Identification Bible on page 563 (top left & 3rd down on left) and page 564 (top left). These were the same pictures that (RM) had picked out.

RM and DT described AB's step-father as a black male in his mid-30's, 5'10", with short brown hair and a small mustache. They also described AB's mother as a light-skinned black female in her mid-30's, 5'4", skinny, with shoulder length hair and freckles.

Officer Bruckhart averred that in his belief, the information provided by RM and DT was true and correct. Officer Bruckhart averred that he disclosed the identities of RM, DT and AB to the magisterial district justice at the time he applied for the search warrant and asked the magisterial district justice to make a record of that information.

According to the affidavit, review of West York Area medical records revealed that AB resides at 2155 Carriage Run Road with Adams and Husband. York County tax assessment records indicated that 2155 Carriage Run Road is owned by Ali Sabrkesh and Adams. A New York driving record check indicated that Adams' date of birth was October 26, 1976, matching the approximate age that RM and DT attributed to AB's mother. On June 6, 2012, two vehicles were parked outside of this property, both of which were registered to Adams. Based on this information, Officer Bruckhart believed that Adams resided at 2155 Carriage Run Road and was AB's mother.

Officer Bruckhart averred that PennDOT records indicated that Husband, born on June 18, 1983, resides at 2155 Carriage Run Road. A criminal history check showed that Husband had been convicted in Maryland for assault in 2004 and for drug-related offenses in 2007, and he had been arrested in York County on May 7, 2012 and charged with possession with intent to deliver cocaine. On that date, following a traffic stop, state troopers found 200 bags of crack cocaine and $800.00 in cash in Husband's possession. Husband claimed to a trooper that the cash belonged to his wife. Based on this information, Officer Bruckhart believed that Husband resided at 2155 Carriage Run Road and was AB's step-father.

On June 7, 2012, a district justice issued a warrant to search the residence at 2155 Carriage Run Road. On June 8, 2012, police officers executed the warrant at this address and found 95 grams of crack cocaine, a

pair of brass knuckles, drug packaging items, digital scales, various loaded firearms and over $20,000.00 in cash in the master bedroom.

We apply the "totality of circumstances" test in determining whether probable cause exists for the issuance of a search warrant. Our Supreme Court recently defined this test as follows:

> Prior to 1983, in order to establish probable cause for the issuance of a search warrant based on information received from a confidential informant, an affidavit of probable cause had to satisfy a two-part test. The test required the affiant to set forth: 1) the basis of the informant's knowledge; and 2) facts sufficient to establish the informant's veracity or reliability. **Spinelli v. United States**, 393 U.S. 410 [] (1969); **Aguilar v. Texas**, 378 U.S. 108 [] (1964). In 1983, the U.S. Supreme Court abandoned this 'two-part' test and adopted a 'totality-of-the-circumstances' test. **Illinois v. Gates**, 462 U.S. 213, 233 [] (1983). The Court held that the **Aguilar–Spinelli** factors were no longer rigid, independent requirements that had to be satisfied, but instead, were merely relevant factors among the totality of the circumstances necessary to show probable cause. **Id.**
>
> The High Court noted that the prongs of the former two-part test had been intended as 'guides to a magistrate's determination of probable cause' that required no 'elaborate exegeses of an informant's tip.' **Id.** at 231 n. 6 []. The Court emphasized that probable cause is a fluid concept that turns on the assessment of probabilities in factual contexts that are 'not readily, or even usefully, reduced to a neat set of legal rules.' **Id.** at 232 []. The Court explained that a totality-of-the-circumstances analysis permits a balanced assessment of the relative weights of all the various indicia of reliability and unreliability attending an informant's tip. **Id.** at 234–235 []. Moreover, the Court criticized the former two-part test as having 'encouraged an excessively technical dissection of informants' tips, with undue attention being focused on isolated issues that cannot be sensibly divorced from the other facts presented to the magistrate.' **Id.**
>
> This Court adopted **Gates** as the applicable law under the Pennsylvania Constitution in **Commonwealth v. Gray**, [] 503 A.2d 921 ([Pa.]1985). We noted that 'in **Gates**, the United

States Supreme Court decided that its prior holdings creating "tests" for determining whether or not probable cause existed ran contrary to the notion of probable cause as based on "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' *Id.* at 925 (quoting *Gates, supra* at 231 []). We stated that a CI's veracity and basis of knowledge are but factors among the totality of the circumstances, as follows:

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given **all the circumstances** set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for … conclud[ing] that probable cause existed.'

*Id.* at 925 (quoting *Gates, supra* at 238–39 []) (emphasis added).

*Commonwealth v. Clark*, 28 A.3d 1284, 1286-88 (Pa.2011). The magistrate should limit his review to the facts contained in the four corners of the probable cause affidavit. *Commonwealth v. Smith*, 784 A.2d 182, 184 (Pa.Super.2001).

Judicial review as to whether a search warrant is supported by probable cause "is generally accomplished via a close review of the affidavit." *Commonwealth v. Chapman*, -- A.3d --, 2016 WL 1225726, *2 (Pa., 3/29/16). "Certainly, there is a wealth of precedent governing such review as it concerns information received from unidentified persons and confidential informants." *Id*. (citing *Commonwealth v. Luv,* 735 A.2d 87,

90 (1999)) ("a determination of probable cause based upon information received from a confidential informant depends upon the informant's reliability and basis of knowledge viewed in a common sense, non-technical manner").

Based on the totality of the facts contained in Officer Bruckhart's affidavit, there was a fair probability that evidence of illegal drug trafficking activities would be found in Adams' residence. Two juveniles, RM and DT, had been in the master bedroom in Adams' residence on at least five occasions in the month prior to the issuance of the warrant, the last occasion being the day before the warrant was issued. On each occasion, the juveniles observed what they believed was crack cocaine, large quantities of cash and numerous firearms. Police also learned that Husband was a felon not permitted to possess a firearm and had two former drug-related convictions. One month before the issuance of the warrant, he was arrested by Pennsylvania state troopers with a large quantity of crack cocaine and cash in his possession. This information, viewed collectively, provided probable cause for the search warrant for Adams' residence.

Adams argues that the two juvenile informants were unreliable, because the use of the initials "RM" and "DT" in the affidavit instead of their full names made them tantamount to confidential informants, and the police failed to perform sufficient investigation to corroborate their tips. We disagree. "This Court has repeatedly rejected the argument that an officer

relying on statements from an ordinary citizen, in contrast to a police informant, must establish the citizen's credibility and reliability." ***Commonwealth v. Lyons***, 79 A.3d 1053, 1064-65 (Pa.2013). "Where an informant is not a paid, unknown tipster but instead an identified eyewitness to a crime who voluntarily reports his observations to the police, the trustworthiness of such a person may be presumed." ***Commonwealth v. Widenmoyer***, 539 A.2d 1291, 1295 (Pa.1988). An ordinary citizen who reports a crime which has been committed in his presence, or that a crime is being or will be committed,

> stands on much different ground than a police informer. He is a witness to criminal activity who acts with an intent to aid the police in law enforcement because of his concern for society or for his own safety. He does not expect any gain or concession in exchange for his information. An informer of this type usually would not have more than one opportunity to supply information to the police, thereby precluding proof of his reliability by pointing to previous accurate information which he has supplied.

*Id*. Information from a known informant is more reliable than from an anonymous informant because "a known informant places himself or herself at risk of prosecution for filing a false claim if the tip is untrue, whereas an unknown informant faces no such risk." ***Commonwealth v. Jackson***, 698 A.2d 571, 574 (Pa.1997). The same holds true for informants known to the police but not named in the warrant; like named informants, they remain subject to arrest for false reports. LaFave, 2 Search & Seizure, § 3.4(a) n. 83 (citing ***State v. Ferguson***, 624 S.W.2d 840 (Mo.1981)) (informant

deemed reliable where police knew his identity but he requested anonymity because he was informing on family member).

Further, "when two independent informants both supply the same information about a particular crime to the police,

> each source tends inherently to bolster the reliability of the other. Although the information supplied by one questionable source may be insufficient, the probability is extremely small that a second independent source would supply identical information if it were not probably accurate.

*Commonwealth v. Mamon*, 297 A.2d 471, 477 (Pa.1972).

The affidavit of probable cause in this case states that RM and DT gave separate, independent statements to the police. The police revealed RM's and DT's identities to the magisterial district justice who issued the search warrant for Adams' residence. Had they given false information, RM and DT faced punishment from the police (and possibly from RM's and DT's parents). *See Jackson*, 698 A.2d at 574. There is no indication that RM and DT expected anything in return for their information; it appears that they approached the police simply as a matter of civic duty. RM and DT gave virtually identical accounts about the circumstances underlying their visits to Adams' bedroom and the items that they saw inside. Each statement bolstered the reliability of the other statement; there is little chance that they would have been so consistent if they were not truthful. For these reasons, the affidavit of probable cause had ample indicia of RM's and DT's reliability.

Adams also contends that the affidavit failed to demonstrate that RM and DT were "competent" to serve as informants. Citing authorities that courts must examine a child's competency before the child testifies in court,[4] Adams argues that an affidavit of probable cause must provide sufficient indicia that a child informant is competent to act as an informant. We know of no law – nor does Adams point us to any – that courts must specifically evaluate a child informant's "competency" while reviewing an affidavit of probable cause. In our opinion, as a practical matter, when the affidavit demonstrates that an informant is truthful and reliable, the informant is competent as well. Here, the affidavit of probable cause furnished adequate evidence of RM's and DT's veracity and reliability, so further inquiry into their competency would have been repetitious. Adams' argument relating to competency fails.

In her second argument, Adams asserts that the evidence was insufficient to sustain her two convictions for conspiracy with intent to

_____

[4] *See Commonwealth v. Rosche*, 156 A.2d 307, 310 (Pa.1959) (for child under age 14 to testify in court, "there must be (1) such capacity to communicate, including as it does both an ability to understand questions and to frame and express intelligent answers, (2) mental capacity to observe the occurrence itself and the capacity of remembering what it is that she is called to testify about and (3) a consciousness of the duty to speak the truth"). The Court created these competency requirements because children are "fanciful creatures who have difficulty distinguishing fantasy from reality; who when asked a question want to give the 'right' answer, the answer that pleases the interrogator; who are subject to repeat ideas placed in their heads by others; and who have limited capacity for accurate memory." *Commonwealth v. Delbridge*, 855 A.2d 27, 32-33 (Pa.2003).

possess a controlled substance and conspiracy to possess a controlled

substance with intent to deliver. Our standard of review for such challenges

is well-settled:

> [W]hether[,] viewing all the evidence admitted at trial in the light most favorable to the [Commonwealth as the] verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [the above] test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence.

***Commonwealth v. Gonzalez***, 121 A.3d 711, 716 (Pa.Super.2015).

The Crimes Code defines the offense of criminal conspiracy, in

pertinent part, as follows:

> (a) A person is guilty of conspiracy with another person or persons to commit a crime if with the intent of promoting or facilitating its commission he:
>
> (1) agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes a crime or an attempt or solicitation to commit such crime; or
>
> (2) agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime.
>
> …
>
> (e) Overt act. - No person may be convicted of conspiracy to commit a crime unless an overt act in pursuance of such

conspiracy is alleged and proved to have been done by him or by a person with whom he conspired.

18 Pa.C.S. § 903. To sustain a conviction for criminal conspiracy, the Commonwealth must prove beyond a reasonable doubt that the defendant (1) entered into an agreement to commit or aid in an a criminal act with another person or persons (2) with a shared criminal intent, and that (3) an overt act was done in furtherance of the conspiracy. *Commonwealth v. Johnson*, 920 A.2d 873, 878-79 (Pa.Super.2007). The defendant herself need not commit the overt act; it need only be committed by a co-conspirator. *Id*. We have explained the agreement element of conspiracy as follows:

The essence of a criminal conspiracy is a common understanding, no matter how it came into being, that a particular criminal objective be accomplished. Therefore, a conviction for conspiracy requires proof of the existence of a shared criminal intent. An explicit or formal agreement to commit crimes can seldom, if ever, be proved and it need not be, for proof of a criminal partnership is almost invariably extracted from the circumstances that attend its activities. Thus, a conspiracy may be inferred where it is demonstrated that the relation, conduct, or circumstance of the parties, and the overt acts of the coconspirators sufficiently prove the formation of a criminal confederation. The conduct of the parties and the circumstances surrounding their conduct may create a web of evidence linking the accused to the alleged conspiracy beyond a reasonable doubt. Even if the conspirator did not act as a principal in committing the underlying crime, he is still criminally liable for the actions of his co-conspirators in furtherance of the conspiracy.

*Johnson*, 920 A.2d at 878.

- 15 -

Here, the trial testimony established the following evidence of conspiracy against Adams: on May 7, 2012, at approximately 12:30 a.m., Husband was driving northbound in Adams' Honda on I-83 in York County when state troopers stopped the vehicle because of an expired registration. Husband was alone in the vehicle. He had no identification on his person, and the troopers discovered that his Maryland driver's license was suspended. The Honda was towed to the State Police Impound Yard, where a trooper performed an inventory search of the vehicle to safeguard its contents. The trooper discovered 200 bags of crack cocaine between the Honda's center console and the driver's seat along with a bag containing a larger rock of crack cocaine and some suspected powder cocaine. Subsequent chemical analysis revealed that the cocaine weighed 31.3 grams. An additional search turned up $600.00 in cash near the center console and two cell phones. Husband was placed under arrest, and when he was searched incident to his arrest, troopers found $212.00 in cash on his person. Later that day, Adams appeared at the State Police Barracks, and the Honda was released to her. Tr., at 84-98, 119.

One month later, on June 8, 2012, Detective Bruckhart of the West Manchester Township Police Department and the York County Drug Task Force executed a search warrant at the residence located at 2155 Carriage Run Road in West Manchester Township, York County, with a number of assisting police officers. Husband was the only person present in the home

at that time. He was on the bed in the master bedroom on the second floor. Tr., at 176-186, 205, 238, 246.

During a search of the residence, officers found a bag containing 95 grams of suspected crack cocaine hidden directly under the mattress where Husband had been sleeping. In the same location, they found a pair of brass knuckles and some suspected marijuana. They also found a Dell laptop computer under the bed. Tr., at 209-214, 233, 247.

Two nightstands flanked the bed. Atop the north nightstand was $160.00 in cash and a bag containing sandwich bag tops that are routinely used to package crack cocaine. Inside the top drawer, officers found $18,000.00 in cash, multiple pieces of mail addressed to Husband and Adams, a box of Ziploc bags, a box of razor blades, a checkbook in Adams' name, and a plastic container with a small amount of loose crack cocaine inside. In the second drawer, the officers found a shoebox containing $2,166.00 in cash, a Ziploc bag containing an assortment of drug packaging materials, a digital scale with cocaine residue on it and three female Tiffany rings. In the third drawer, the officers seized a box of .40 caliber ammunition, a box of .22 caliber ammunition, a gun lock, a box of .380 caliber bullets, a .380 caliber magazine, 9-mm ammunition and a .32 caliber loaded handgun. Tr., at 216-229, 243.

A canvas bag along the wall of the master bedroom contained a Pennsylvania identification card belonging to Husband, three small razor

blades and several very small green Ziploc bags. A closet in the master bedroom contained an ID belonging to Adams, mail addressed to her, four additional firearms and a Dell laptop computer. The computer case contained some drug packaging material, one .40 caliber bullet, a TracFone and mail addressed to Adams. A man's jacket hanging in the closet contained some drug packaging material, a .40 caliber handgun magazine and one .40 caliber round of ammunition. Tr., at 229-233.

Detective Bruckhart called Adams on her cell phone and advised her that the police were executing a search warrant at her residence. He requested that she return to the residence, and she did so ninety minutes later. Detective Fenstermacher advised her that the police had found a significant amount of crack cocaine in her bedroom along with some cash, and that they were trying to determine who owned the cocaine. Adams stated that the cocaine did not belong to her and would have to belong to her husband. The detective asked if she knew her husband was involved with crack cocaine sales, and she said "No." Tr., at 182, 320-321, 342.

Later, Adams asked if she could speak with her husband, and the police gave the pair an opportunity to converse with one another in front of the officers. After the couple concluded their conversation, Husband claimed that all seized items belonged to him. He stated that he had placed the crack cocaine between the mattress and the box spring. He acknowledged that he sold crack cocaine in Baltimore on a daily basis, conducted between

40-100 transactions per day, and averaged a daily profit of $2,000.00. Husband also stated that his last meeting with his source took place about a week and a half earlier, and that these meetings typically occurred on I-83 at the Maryland line. He acknowledged possessing the firearms that the police seized and said that he used them to protect himself. Tr., at 317, 320, 323-328.

Adams admitted to knowing that her husband was dealing crack cocaine and was aware he had cocaine stored in their residence. Although she claimed ignorance of the extent of his drug trafficking, she admitted that Husband gave her cash to pay for household expenses, and she knew that he stored cash in the upstairs bedroom. She admitted believing that some of this cash came from cocaine sales. She stated that she alone handled the checkbook. Tr., at 328-329, 348-349, 351, 391-92.

A state police crime lab forensic chemist confirmed that the substances seized in the bedroom were 94.7 grams of cocaine. Tr., at 296-308, 314.

Detective Craig Fenstermacher, an expert on drug packaging and sales, testified that crack cocaine is typically sold in some type of plastic bag corner or small Ziploc bags, and that one tenth of a gram of cocaine normally sold on the street for $20.00. He indicated that the wholesale value of the 94.7 grams of cocaine found in the master bedroom was between $3,800.00 and $3,900.00. Finally, he opined that the cocaine found in Adams' vehicle on May 7, 2012 was possessed with the intent to

distribute it to other individuals. He indicated that the cocaine found during the execution of the search warrant at Adams' residence on June 8, 2012 was the same as the cocaine located in her vehicle on May 7, 2012. Tr., at 256-268, 281, 287, 291.

Construed in the light most favorable to the Commonwealth, the evidence demonstrates that Adams and Husband shared an understanding both to possess cocaine and possess cocaine with intent to deliver it. The sheer volume of cocaine, money, drug paraphernalia, firearms and ammunition in the couple's master bedroom establishes this agreement, as does Adams' admission that she knew Husband stored money in the bedroom and gave her cash for household expenses, some of which she believed came from cocaine sales. The fact that Adams initially lied when she returned to her residence about knowing that Husband was trafficking cocaine is further consciousness of guilt. *Commonwealth v. Donelly*, 653 A.2d 35, 37 (Pa.Super.1995) (fabrication of false statements by accused is evidence from which jury may infer that they were made with intent to mislead police and are indicative of guilt). Husband's storage of cocaine, money, drug paraphernalia, firearms and ammunition in the master bedroom was an overt act in furtherance of the conspiracy. Another overt act was Husband's driving on I-83 on May 7, 2012 with 200 bags of crack cocaine, a bag containing a rock of crack cocaine and powder cocaine,

substantial amounts of cash in the car and on his person, and two cell phones.

The quantum of evidence assembled by the Commonwealth is analogous to other decisions in which we found the evidence sufficient to sustain the defendant's conviction for conspiracy to possess controlled substances with intent to deliver. *See*, *e.g.*, *Commonwealth v. Irwin*, -- A.3d --, 2016 WL 638722, *7-8 (Pa.Super., 2/8/16) (defendant challenged his conviction for conspiracy to commit possession with intent to deliver by pointing to evidence that he never enjoyed exclusive access to bedroom containing safe or resided at address in question, and authorities did not find heroin on his person or observe him selling heroin at the time of his arrest; nevertheless, evidence was sufficient to support conspiracy conviction, particularly testimony from co-defendant that he allowed defendant to use his residence as base for selling heroin to others in exchange for free heroin, and defendant knew combination to safe that contained six bundles of heroin); *Commonwealth v. Jones*, 874 A.2d 105, 122-23 (Pa.Super.2005) (circumstantial evidence sufficiently established conspiracy to possess with intent to deliver controlled substance; evidence established close relationship between defendant and his passengers, defendant and passenger both indicated passenger was defendant's girlfriend and defendant and other passenger both said they were cousins, police discovered cocaine in area where any of the passengers could have seen it

and exercised control over it, and passengers made inconsistent statements regarding duration and purpose of their trip); ***Commonwealth v. Kitchener***, 506 A.2d 941, 946 (Pa.Super.1986) (evidence sufficient to sustain conviction for conspiracy to possess controlled substances where defendant and her codefendant, being sole adult residents of home, stored large quantities of contraband in areas which were peculiarly within their knowledge and access).

For these reasons, Adams' challenge to the sufficiency of the evidence underlying her conspiracy convictions is devoid of merit.

Judgment of sentence affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 5/24/2016