J-S29041-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| ERIC DILLARD | : | |
| | : | |
| Appellant | : | No. 3032 EDA 2017 |

Appeal from the Judgment of Sentence August 7, 2017
In the Court of Common Pleas of Bucks County Criminal Division at
No(s): CP-09-CR-0003372-2016

BEFORE: PANELLA, J., MURRAY, J., and STEVENS, P.J.E.*

MEMORANDUM BY STEVENS, P.J.E.: **FILED JUNE 28, 2018**

Appellant Eric Dillard appeals from the judgment of sentence entered by the Court of Common Pleas of Bucks County after the trial court convicted Appellant of two counts of first-degree murder, attempted murder, four counts of criminal conspiracy, three counts of robbery, and other related offenses. We affirm on the basis of the trial court's well-reasoned opinion.

We adopt the thorough and comprehensive summary of the detailed factual background and procedural history of this case as set forth in the Opinion of the Honorable Rea B. Boylan, for the purpose of this appeal. ***See*** Trial Court Opinion (T.C.O.), 1/19/18, at 3-14. Therefore, we will briefly summarize the facts of this case.

The Commonwealth's evidence established that Appellant and two other men, Anthony King and Demetrius Baker, entered a residence located in Bristol, Pennsylvania and robbed Lamel Duffy, Joshua Johnson, and Terrance

_____
* Former Justice specially assigned to the Superior Court.

Moss. Appellant cruelly pushed Duffy from his wheelchair and burnt Duffy's forearm with a butter knife that Appellant had heated on the stove. Appellant and his cohorts made the victims lie on the floor and restrained the victims' hands behind their backs with zip ties.

After stealing the victims' money, drugs, jewelry, cell phones, clothes, and gaming system, Appellant and King used two different firearms to shoot at least four bullets at the victims' heads. Johnson and Moss did not survive their injuries; medical examiners determined that Johnson's cause of death was a gunshot wound to the head and Moss's cause of death was a gunshot wound to the neck. Duffy was fortunate to survive near fatal gunshot wounds to his head and clavicle.

At trial, Baker testified to Appellant's involvement in the aforementioned crimes.[1] Baker indicated that he participated in the robbery, took some of the stolen property, and was waiting in his car for King and Appellant when the fatal shots were fired; Baker recalled that, upon leaving the crime scene, King and Appellant were noticeably happy and Appellant stated that he was "going to take money for the rest of his life." Notes of Testimony (N.T.), Trial, 7/31/17, at 97-98. The men split the money and the victims' belongings.

Appellant, King, and Baker were all eventually connected to the robbery and shootings after officers recovered one of the murder weapons from a silver Lexus illegally parked in a Philadelphia Parking Authority lot; the officers

---

[1] King did not participate in Appellant's trial as he was murdered in Philadelphia, Pennsylvania shortly after the robbery and shootings in this case.

observed that one of the vehicle's windows was rolled down and noticed a black handgun sticking out from underneath a sweatshirt in the back seat. Officers discovered the vehicle belonged to the wife of Christopher Wright, a friend of Appellant's, who eventually identified the firearm as belonging to Appellant. Wright testified that Appellant had admitted his involvement in the robbery, flaunted a watch that he had stolen from one of the victims, and showed Wright the black handgun in his possession that was later found in Wright's vehicle. Ballistics subsequently determined that the bullets that had caused Johnson and Moss's fatal head wounds were fired from the firearm that had been connected to Appellant.

Moreover, Kyle Stallworth, an inmate who was incarcerated with Appellant after the murders had occurred, testified that Appellant admitted his involvement in the Bristol robberies and murders. Appellant gave Stallworth specific details about the crimes, including that he burned one of the victims with a butter knife heated on the stove and shot one of the victims in the head. N.T. Trial, 8/1/17, 88-91.

At the conclusion of the three-day bench trial, the trial court convicted Appellant of two counts of first-degree murder, attempted murder, aggravated assault, three counts of robbery, burglary, possession of an instrument of crime, and four counts of conspiracy. After the penalty phase of Appellant's trial, the lower court sentenced Appellant to consecutive terms of life imprisonment without parole for the murder convictions and a concurrent term

of twenty to forty years' imprisonment for the attempted murder conviction. No further penalties were imposed.

Appellant filed a timely appeal and complied with the trial court's direction to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Appellant presents the following issues for our review on appeal:

1. Did the lower court err in its determination that the Commonwealth adduced sufficient evidence to support Appellant's convictions for murder in the first degree and conspiracy to commit murder in regard to Counts 1 through 4 of the criminal information?

2. Did the lower court err in its determination that the Commonwealth adduced sufficient evidence to support Appellant's conviction for criminal attempt, murder in the first degree in regard to count 5 of the criminal information?

Appellant's Brief, at 7.

In reviewing these sufficiency challenges, we observe:

The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for [that of] the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the

- 4 -

credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

**Commonwealth v. Smith**, 181 A.3d 1168, 1184–85 (Pa.Super. 2018) (quoting **Commonwealth v. Graham**, 81 A.3d 137, 142 (Pa.Super. 2013) (quotation marks and quotation omitted)).

As an initial matter, we note that the trial court found that Appellant waived all of his sufficiency claims as he failed to identify with any specificity in his Rule 1925(b) statement the elements he wished to challenge with respect to each conviction. We agree. It is well established that:

> In order to preserve a challenge to the sufficiency of the evidence on appeal, an appellant's Rule 1925(b) statement must state with specificity the element or elements upon which the appellant alleges that the evidence was insufficient. **Commonwealth v. Gibbs**, 981 A.2d 274, 281 (Pa. Super. 2009). "Such specificity is of particular importance in cases where, as here, the appellant was convicted of multiple crimes each of which contains numerous elements that the Commonwealth must prove beyond a reasonable doubt." **Id.** at 281 (internal citation omitted).

**Commonwealth v. Brown**, ____ A.3d____, 1161 WDA 2017 (Pa.Super. May 4, 2018). In **Commonwealth v. Garland**, 63 A.3d 339, 344 (Pa.Super. 2013), this Court found that the appellant had waived his sufficiency claim by failing to specify in his Rule 1925(b) statement which of the elements of his convictions that he wished to challenge.

In the same manner, we conclude that Appellant has waived his challenges to the sufficiency of the evidence supporting five of his convictions due to his failure to state his claims with specificity. Nevertheless, even assuming *arguendo* that Appellant had not waived these challenges,

- 5 -

Appellant's claims are clearly meritless. After reviewing Appellant's brief, the certified record, the relevant law, and the trial court's opinion, we find there has been no error in this case and that Judge Boylan's opinion, entered January 19, 2018, accurately disposes of Appellant's issues on appeal. Therefore, we affirm on the basis of Judge Boylan's thorough opinion and adopt it as our own. In any future filing with this or any other court addressing this ruling, the filing party shall attach a copy of Judge Boylan's opinion.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/28/18

IN THE COURT OF COMMON PLEAS OF BUCKS COUNTY, PENNSYLVANIA
CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA    :

                               :      No. CP-09-CR-0003372-2016

v.                            :

                               :

ERIC DILLARD                   :

## OPINION

This matter arises out of a conspiracy to commit robbery and murder when, on July 7 and July 8, 2014, Appellant Eric Dillard ("Appellant" or "Dillard"), along with Anthony King and Demetrius Baker, entered a residence located at 913 Winder Drive in Bristol, Bucks County, Pennsylvania and robbed Lamel Duffy, Joshua Johnson, and Terrance Moss. After securing the victims' hands behind their backs, Appellant and King fired at least four shots with two different handguns, resulting in the deaths of Johnson and Moss and the wounding of Duffy.[1] Appellant now appeals to the Superior Court of Pennsylvania from the Judgment of Sentence imposed in this matter on August 7, 2017. This Opinion is filed pursuant to Pennsylvania Rule of Appellate Procedure 1925(a).

## PROCEDURAL HISTORY

On March 15, 2017, a pre-trial hearing was held on Appellant's Motion to Suppress Evidence related to the seizure by police of a handgun on July 8, 2014, from a Lexus automobile in Philadelphia, Pennsylvania. On April 4, 2017, this Court entered Findings of Fact, Conclusions of Law, a Memorandum Opinion and Order denying the motion. (*See* Exhibit "A.")

On July 31, 2017, after an extensive colloquy, Appellant waived his right to a trial by jury and proceeded with a waiver trial.

---

[1] King did not participate in this trial because he was found murdered in Philadelphia, PA shortly after these murders.

On August 2, 2017, following a three day waiver trial, Appellant was found guilty of two counts of First Degree Murder,[2] one count of Attempted Murder,[3] one count of Aggravated Assault,[4] three counts of Robbery,[5] one count of Burglary,[6] one count of Possession of an Instrument of Crime[7] and four counts of Conspiracy[8] related to the foregoing counts.[9] (*See* N.T. 8/2/17, pp. 60-62.)

The penalty phase of Appellant's trial was held on August 4, 2017. On August 7, 2017, this Court found that the aggravating factors proven by the Commonwealth did not outweigh the mitigating circumstances presented by the defense. Appellant was sentenced to consecutive terms of incarceration for life without parole on Counts 1 and 2 for First Degree Murder and a concurrent term of twenty to forty years on Count 5 for Attempted Murder. No further penalties were imposed on the remaining counts. (*See* N.T. 8/7/17, pp. 2-7.)

On September 5, 2017, Appellant filed a Notice of Appeal with the Superior Court of Pennsylvania from the judgment of sentence entered on August 7, 2017. On September 7, 2017, this Court issued an Order pursuant to Pa.R.A.P. 1925(b) directing Appellant to file a Concise Statement of Matters Complained of on Appeal. On September 29, 2017, Appellant filed a Petition for Extension of Time to file the Concise Statement due to the unavailability of the pre-trial and trial transcripts. On October 2, 2017, in response to Appellant's petition, the Court ordered the immediate transcription of all proceedings in this matter. In addition, copies of the transcripts

---

[2] 18 Pa.C.S.A. § 2501(a)
[3] 18 Pa.C.S.A. § 901(a)
[4] 18 Pa.C.S.A. § 2702(a)(1)
[5] 18 Pa.C.S.A. § 3701(a)(1)(i)
[6] 18 Pa.C.S.A. § 3502(a)(1)
[7] 18 Pa.C.S.A. § 907(a)
[8] 18 Pa.C.S.A. § 903
[9] The Commonwealth *nolle prosequied* the remaining counts contained in the Criminal Information including six (6) counts of Robbery, 18 Pa.C.S.A. § 3701(a)((1)(ii); four (4) counts of related Conspiracy, 18 Pa.C.S.A. § 903; and one (1) count of Theft, 18 Pa.C.S.A. § 3921(a).

2

were to be provided to Appellant's counsel, and a Concise Statement of Matters Complained of on Appeal was due ten (10) days after receipt of the transcripts by Appellant's counsel.

On December 9, 2017, Appellant filed his Concise Statement.

## FACTUAL BACKGROUND

At trial, the Commonwealth presented the testimony of co-defendant Demetrius Baker ("Baker"). Baker testified that through his employment as a "club promoter" for a strip club in Philadelphia, he became acquainted with Anthony King ("King"), whom he knew as "AK." Baker testified that King approached him on July 6, 2014, with a plan to rob a house in Bristol, Bucks County, where the residents would have approximately $30,000 to $40,000 in their possession as a result of marijuana and drug sales which occurred there. King told Baker that he would invite a friend who owned a gun to participate in the robbery. Baker admitted that he agreed to go along and commit the robbery because he "heard the money amount" and was "greedy." (N.T. 7/31/17, pp. 38-52.)

Baker met King the next day at the strip club and they drove in Baker's black 2006 BMW, using King's directions, to a residence somewhere in West Philadelphia. King's friend was not there so they drove around for approximately thirty minutes while King attempted to locate him via cell phone calls and texting. King then received a call and directed Baker to a nearby corner where they met the friend who had a limp and was introduced to Baker as "Wood," and whom King described as his "twin brother." Baker subsequently identified Appellant in Court as "Wood." (N.T. 7/31/17, pp. 52-65.)

Baker released the latch to the hood of his car and watched Appellant place a silver semi-automatic gun he had brought under the hood. King and Appellant then got into the car and they proceeded to drive to Bristol, Bucks County. Appellant provided the initial directions on how to

3

leave Philadelphia, and then King provided the directions to the residence in Bristol at 913 Winder Drive. According to Baker, the three of them discussed the plan to rob the residence during the drive to Bristol. Instead of using their names, King assigned each of them a number - one, two, three. The plan was to go in and commit the robbery if "the light was on" in the residence because that meant the occupants "still was in business, they were selling drugs." King's plan was that "he was going to go in and act like he was buying drugs, and we was to go in and rob all of them." Appellant was in the back seat pre-looping "zip ties" together for restraining the victims. (N.T. 7/31/17, pp. 65-72, 119.)

The group arrived in Bristol at approximately 11:00 p.m. and parked on the opposite side of the street from 913 Winder Drive. Baker observed Appellant retrieve the gun from under the hood of the car. Due to the number of cars that were arriving at the residence, presumably to purchase drugs, King revised their plan and instructed that "when the light turn off then he's going to go and buy drugs ... and we would still go in and rob all of them." (N.T. 7/31/17, pp. 68-75.)

Baker observed a "darker gentleman" come out of the house and converse with a female in a car and then return into the house. King followed the darker gentleman into the house while communicating with Baker via cell phone. King then called Baker from inside the house and told him to bring in "three girls." This was the signal that three people were inside the house and that Baker and Appellant should come in. Baker said he "had on a hoodie and black shirt over my face," and Appellant "had a white T-shirt over his face," and they were wearing gloves. He said King was not wearing any disguise. (N.T. 7/31/17, pp.75-79.)

It was approximately midnight when Baker and Appellant proceeded into the house. Appellant "told everybody to freeze because he had the gun in his hand, and [King] jumped back and put his hands up and said, oh, man." Baker said he punched a "light skinned gentleman" as

4

they entered the house "for a scare tactic to let them know we were serious," and after "everybody put their hands up" he then "pulled the guy out [of] the wheelchair, and he was sitting on the gun" which was a "little small revolver." Appellant then picked up the revolver and handed the semi-automatic gun he had come with to King. King, no longer pretending to purchase drugs, then instructed Baker and Appellant to insure that no one else was in the house.

After checking the various rooms, Baker and Appellant returned to the living room area where the three victims were lying on their stomachs on the floor. Appellant then provided him and King with the zip ties and directed them to restrain the three victims on the floor. Baker said he zip tied the darker gentleman, while King zip tied the individual who had been in the wheelchair. Baker testified that as he was zip tying the darker gentleman, Appellant came over and stepped on the man's hand and took the man's watch and jewelry from his wrist. Appellant then picked the victims' cell phones up off the ground. (N.T. 7/31/17, pp.79-87, 90, 96, 129.)

Baker testified that after the victims had been zip tied, King told him to "go in the room and look for drugs." After repeated searches Baker found marijuana in a freezer ziplock bag and he also found money in a "tupperware bin, like a dirty clothes bin in a sock," where both King and one of the victims had said the money would be located. (N.T. 7/31/17, pp. 88-91.)

After he retrieved the money and marijuana, Baker said, "let's go," but King stated that he was "taking everything," and then proceeded to place "clothes and sneakers and anything he could put his hands on" into a black trash bag. Appellant also stated they were "taking everything," and he instructed Baker to take an X-box and put it into the black trash bag. He also told Baker to take the X-box cord but Baker refused. Appellant remained in the house while Baker and King then went out to their car and King placed the black trash bag, which also contained the marijuana, into the trunk of the car. Baker said that he placed the money they had taken into his pocket and he got

5

into the driver's seat and started the car. King, however, stated, "I will be back. I got to get something." (N.T. 7/31/17, pp. 88-94, 129.)

While Baker was sitting in the car he lowered the passenger side window slightly. He then heard multiple gunshots and a few seconds later King and Appellant came walking out. He said they appeared "happy," and after they got into the car King stated that "that was easy" and "I'm going to take money for the rest of my life." Baker stated that when they got into the car King had the semi-automatic gun in his possession and Appellant had the revolver. (N.T. 7/31/17, pp. 95-98, 102-103.)

King then gave driving directions to Baker to leave the neighborhood. When Baker made an incorrect right hand turn, King "snapped" and "started cussing" at him, but they eventually returned to Philadelphia. During the drive back they did not discuss the events that had just occurred. Baker gave the money in his pocket to King, who counted it and determined that there was "a little over $3,000," and they then split the money. Baker observed Appellant remove the batteries from the victims' cell phones he had taken from the residence and then throw the phones out of the car window somewhere along Roosevelt Boulevard. (N.T. 7/31/17, pp. 98-102.)

Baker said they stopped at the Studio 37 strip club, where King got out of the car for a few minutes, and then they drove to a residence on "Broad and Girard" where "a whole bunch of kids [were] asleep on like pull-out cots and futons." The group stepped over the children and went to the kitchen where they weighed the marijuana and split it three-ways. The X-box was unloaded from the trunk and given to Appellant, and then Baker and King departed. Baker dropped King off at Studio 37 at approximately two o'clock in the morning and drove to his sister's residence in Willow Grove. (N.T. 7/31/17, pp. 103-106.)

6

Baker said he saw Appellant once "a couple of weeks later," and he also saw King who told him that he was "mad at Wood (Appellant) because he didn't finish the job." The last time he saw King was at King's funeral about a month later. (N.T. 7/31/17, pp. 106-107, 120.)

Sergeant Thomas Gaffney of the Bristol Township Police Department testified that he received a telephone call from the Bucks County Dispatch around 12:40 on the morning of July 8, 2014, advising that a resident at 911 Winder Drive claimed someone was at his door who had been shot. He dispatched three additional officers to the scene at 913 Winder Drive, and when he arrived two medical rescue squads were on the scene. Sergeant Gaffney observed that rescue personnel were treating the one victim, Mr. Duffy, and that another victim, Joshua Johnson, whose entire face, head and neck were covered in blood, was being treated in another medical van. When Sergeant Gaffney entered the residence he observed that the area appeared chaotic and a deceased male was lying face down on the floor with his hands bound behind his back with zip ties and an electrical cord. (N.T. 7/31/17, pp. 132-141, 169.)

Detective Greg Beidler of the Bristol Township Police Department testified that he was called to assist with the investigation, and when he entered the residence he observed the deceased victim, Tyrone Moss, lying face down with his hands tied behind his back. The police recovered two .40 caliber shell casings on the nearby couch, a .40 caliber shell casing on the floor near a recliner, and a bullet on the floor near the couch at the scene. Detective Beidler identified a zip tie recovered from the scene that had been pre-looped. He also identified the bullets that had been recovered from the head of Tyrone Moss and from Joshua Johnson. (N.T. 7/31/17, pp. 146, 159, 168-185.)

Although attempts were made to retrieve fingerprints and other forensic evidence at the scene, Detective Beidler stated that the investigators subsequently learned that the suspects had

7

been wearing "gloves over their hands and bags or something over their feet as well," and as a result this evidence was not analyzed. (N.T. 7/31/17, pp. 192-193, 197.)

Christopher Wright, also known as "Shizz," testified that he and Appellant had made plans to "party" on the night of July 7, 2014, but when Appellant failed to show up by midnight and he was unable to contact him, he went to sleep. Appellant subsequently showed up at his house between 1:00 and 2:00 o'clock in the morning, and he and Appellant went to a strip club in the car belonging to his wife, Stephanie Moore Wright. He said they drove his wife's car, a silver Lexus that was titled in her father's name, because it was a "more sportier, more better looking car." (N.T. 7/31/17, pp. 200-208, 222.)

On the way to the strip club Appellant stated that "he had been involved in a robbery and someone had gotten shot in the robbery." Appellant showed Wright a watch that had been taken in the robbery and said some money had been taken. Appellant also had a firearm in his possession which he pulled out and showed to Wright. (N.T. 7/31/17, pp. 209-211.)

When they got to the club, Appellant exchanged some money for smaller bills and they "commenced partying." After two or three hours they left with a female club employee. Wright said that Appellant drove while he and the female "engaged in sexual activity" in the back seat, and then "after that, me and [Appellant] switched and I drove and he got in the back seat and engaged in sexual activity with the female." They then drove to New Jersey, where they dropped the female off, and then returned to Wright's house at approximately 10:00 a.m. in the morning. Wright parked in the Philadelphia Parking Authority ("PPA") parking lot across the street from his residence. (N.T. 7/31/17, pp. 211-214, 216.)

When Wright returned home his wife was unhappy and concerned with the condition of the car. He went out with his wife to inspect the car, and helped Appellant, who was passed out

8

in the passenger seat, into Appellant's car. Appellant then drove off. (N.T. 7/31/17, pp. 214-215, 222-223.)

Wright went back to sleep but was wakened a few hours later by Philadelphia Police detectives who arrested him for possession of a firearm and auto theft. Wright's wife had apparently reported the car stolen, and it had been located in the parking lot across the street, with a firearm on the back seat. Wright stated that it was not his firearm and it looked like the weapon Appellant had had in his possession. (N.T. 7/31/17, pp. 215-218.)

Although he told the police that the firearm belonged to Appellant and not to him, Wright was nevertheless charged on July 8, 2014, with possession and remained in custody for two-and-a-half years. Wright said the charges against him were eventually dropped after an apparent DNA test proved inconclusive and no evidence linked him to the gun. (N.T. 7/31/17, pp. 235-241.)

A number of stipulations were then placed of record: First, it was stipulated that Dr. Ian Hood is the Chief Medical Examiner for Bucks County (Exhibit C-33), and that he conducted and authored the report on the autopsy of Tyrone Moss which concluded that the cause of death was a gunshot wound of the neck (Exhibit C-35). It was next stipulated that Dr. Albert Chu is the Deputy Chief Medical Examiner for the Philadelphia Medical Examiner's Office (Exhibit C-37), and that he authored the report on the autopsy performed on Joshua Johnson (Exhibit C-39) which concluded that the cause of death was a gunshot wound to the head. It was further stipulated that Dr. Cynthia Fusco is an expert in the field of emergency medicine and trauma (Exhibit C-42), and that she was working in the emergency department at Aria Torresdale Hospital when Joshua Johnson was brought in on July 8, 2014, and she eventually pronounced him dead as a result of a gunshot wound to the head. (Exhibit C-44.) A further stipulation was entered that the victim, Lamel Duffy, was brought to the emergency department under the name George Adams, that he

9

was treated for gunshot wounds to the head and clavicle, and that both wounds were "near fatal" (Exhibit C-45). (N.T. 7/31/17, pp. 248-254.)

Arquasha Newkirk testified that she dated the victim Lamel Duffy for about nine years and had a son by him. She said she went to 913 Winder Drive between 11:30 and 12:00 on the night of July 7, 2014, to pick up house keys from Duffy. When she arrived Duffy came out and they had a brief conversation, which was somewhat stressful because she was "pregnant and moody." She observed a dark car with tinted windows parked on the street which she passed when she left. When she eventually learned that Duffy had been shot, Newkirk went to the hospital to visit him. In addition to being shot in the head and back, Duffy had also been burned on his forearm. Newkirk confirmed Duffy wore a watch and earing, and identified the watch shown to her as Exhibit C-4 as belonging to Duffy. Newkirk was no longer in a relationship with Duffy, and at the time of the trial she had last seen him two weeks earlier in Long Island, New York, at his parents' house. She testified that she did not know where he currently was. (N.T. 8/1/17, pp. 4-18.)

Brittany Washington testified that she had been in a relationship with Appellant in 2014, and confirmed that she had exchanged communications with Stephanie Wright via Facebook on the morning of July 8, 2014. In those communications Stephanie Wright expressed her frustration at the police investigation and impoundment of her car as a result of the discovery of the gun and her irritation with the behavior of Christopher Wright and Appellant during the preceding night. (N.T. 8/1/17, pp. 22-26.)

Officer Vincent Luu of the Philadelphia Police Department testified that he was on patrol with his partner on July 8, 2014, when he noticed a silver Lexus illegally parked in the Philadelphia Parking Authority lot near Salford and Market Streets. He saw that the front passenger door window was down and a silver watch and lipstick were on the ground. He then observed a black

10

handgun sticking out from underneath a gray sweatshirt on the rear driver's side seat. Officer Luu called his supervisor, and when the detectives arrived, further investigation revealed a name and address related to the house across the street which led to a "black male from the property" being taken into custody. (N.T. 8/1/17, pp. 30-38.)

Detective Francis Sheridan of the Philadelphia Police Department testified that he responded to the PPA parking lot at Salford and Market Streets on July 8, 2014, and observed the silver Lexus automobile with the front windows down. He also saw the silver wrist watch and gold colored lipstick case lying on the ground outside the passenger door. Upon further investigation he observed the black semi-automatic pistol on the rear seat, which he identified as a Sig Sauer P2340 .40 caliber pistol with three live rounds of Hornady ammunition in the magazine. Further examination of the car revealed a document with the address of 32 North Salford Street belonging to Stephanie and Christopher Wright in the trunk and a used condom in the back seat. (N.T. 8/1/17, pp. 39-47.)

Detective Sheridan confirmed that he subsequently interviewed Appellant in an unrelated investigation, and Appellant revealed that he had two cell phones, an iPhone 4 with the number (267) 971-8503, and a black Motorola with the number (267) 760-7236. (N.T. 8/1/17, pp. 47-48.)

Michael Walp, a detective with the Bucks County District Attorney's Office, testified that after he had been assigned to this case, he met initially with Lamel Duffy at his residence in Willow Grove on Moreland Street, but all subsequent efforts to contact Duffy had been unsuccessful. (N.T. 8/1/17, pp. 56-74.)

Kyle Stallworth, also known as "Kuku," testified that he met Appellant in mid-July of 2014 while they were incarcerated at Graterford Prison. He stated that in a subsequent conversation with Appellant in October of that year Appellant asked him "about a pistol and fingerprints,

11

ballistics, all that bull crap." Later that day, after Stallworth's court appearance in Bucks County for charges of eluding, reckless endangerment, possession of a firearm and DUI, he and Appellant had a further discussion, and they subsequently had a minimum of fifty (50) more discussions related to the events that had transpired in Bristol Township. (N.T. 8/1/17, pp. 74-85.)

Stallworth testified that Appellant told him that the plan was to rob the Bristol Township residence with two other individuals. Appellant told him that he had a "Sig Pro" semi automatic pistol, and the "first thing he did was flip the wheelchair man over" and "tied them up with cable cords and game console cords." Appellant told him that "he burned the wheelchair man with a butter knife, and asked him where everything was at. Once they got everything, on their way out that's when they started shooting." Appellant told Stallworth that he said something to the other person like, "It's over. Kill." Appellant stated that three victims had been shot, that "the first one was a head shot" who died instantly, and that he (Appellant) had shot him. Appellant further related that after the group left the house, he went to West Philly, met "Shizz" and gave him the gun, and then went to "Jersey" with a female friend. Appellant told him that Shizz was subsequently arrested and locked up for the firearm and that Appellant was mad and nervous about that. (N.T. 8/1/17, pp. 85-93.)

On cross-examination, Stallworth acknowledged that he had written a letter to the District Attorney's Office while he was incarcerated suggesting that he had information "about a double homicide in Bristol" and that Appellant claimed that $170,000 was taken in the robbery, although Stallworth believed that figure had been inflated by Appellant. Stallworth also acknowledged that Appellant had told him that "AK" was involved with setting up the robbery and that AK had stayed in the car and the man with the "dreads" (Baker) had done the shootings. (N.T. 8/1/17, pp. 99-108.)

12

Detective David Hanks of the Bucks County District Attorney's Office testified that after he had been assigned to this murder case, Anthony King, or "AK," had become a person of interest. King, however, was murdered shortly afterwards and the investigation began to flounder. Detective Hanks was subsequently made aware of the letter from Stallworth, and he and Detective Slaughter went to interview him. During the interview, Stallworth gave him information consistent with his testimony regarding the statements made to him by Appellant. The following information provided by Stallworth had not been released publicly: the restraining of the victims with the game console cord; the dreadlock hairstyle worn by one of the individuals involved in the robbery; the use of a "Sig Sauer Semi Pro" that used .40 caliber ammunition.; the use of a knife to burn one of the victims; and the recovery by Philadelphia Police of a gun possessed by Shizz. Detective Hanks testified that he had observed a burn mark on Lamel Duffy's forearm that was roughly the same size and shape of a knife, and he identified Exhibit C-30 as a photograph of the crime scene kitchen showing a knife on the bottom left burner of the stove. (N.T. 8/1/17, pp. 135-151.) Detective Hanks explained that the evidence of three recovered shell casings that were ejected from the Sig Sauer and the one bullet recovered at the scene that did not have a matching shell casing was consistent with Stallworth's testimony that the second gun used was a revolver, because a revolver does not eject its casing. (N.T. 8/1/17, pp. 159-161.)

It was also stipulated that Corporal Jeffrey Dietz of the Pennsylvania State Police conducted ballistics testing from which it was determined that the bullets recovered from the heads of Joshua Johnson and Tyrone Moss were fired from the recovered Sig Sauer semi-automatic handgun, and that the mutilated lead bullet and mutilated bullet jacket recovered on the floor of the crime scene were not fired from the Sig Sauer but a different firearm of "either .38/.357/9 millimeter class." (N.T. 8/1/17, pp. 154-158.)

13

Detective Hanks testified that after they obtained the numbers of the cell phones recovered by Detective Sheridan from Appellant, a subsequent "cellphone dump" revealed historical data including the times and locations of all calls made and received by those numbers. From that data the detectives were able to determine the cell phones utilized by Appellant, King, Baker and Wright on July 8, 2014. Using those cell phone records and "Geotime," a cellphone records mapping program, Detective Hanks was able to confirm that Wright had attempted to contact Appellant by cell phone on the night of July 7, 2014, and that Appellant's cellphone had been in the area of Winder Drive in Bristol Township at that time. Detective Hanks confirmed that the locations of King, Appellant and Baker on the night of July 7 and 8, 2014, were consistent with the testimony of Baker and Wright. (N.T. 8/1/17, pp. 161-196, 204-211.)

Detective Hanks testified that their review of the cellphone records revealed "one number that was very interesting" for "Hags and Rags" in South Carolina, which they discovered was associated with a Pamela Baker who lived in Willow Grove. An investigation of her relatives led to a "driver's license of a black male with dreadlocks" who was subsequently determined to be Demetrius Baker. The detectives then met with Baker who was eventually arrested and interviewed at least four more times. Detective Hanks confirmed that the information Baker provided in those interviews, such as zip ties being pre-looped, was consistent with the evidence they had so far gathered. (N.T. 8/1/17, pp.197-217.)

## MATTERS COMPLAINED OF ON APPEAL

In his Concise Statement of Matters Complained of on Appeal, Appellant raises the following issues, *verbatim*:

a. The Court committed an error of law in determining that there was a sufficient amount of admissible evidence to conclude that the Defendant was guilty of Count 1, First Degree Murder.

14

b. The Court committed an error of law in determining that there was a sufficient amount of admissible evidence to conclude that the Defendant was guilty of Count 2, First Degree Murder.

c. The Court committed an error of law in determining that there was a sufficient amount of admissible evidence to conclude that the Defendant was guilty of Count 3, Conspiracy to Commit First Degree Murder.

d. The Court committed an error of law in determining that there was a sufficient amount of admissible evidence to conclude that the Defendant was guilty of Count 4, Conspiracy to Commit First Degree Murder.

e. The Court committed an error of law in determining that there was a sufficient amount of admissible evidence to conclude that the Defendant was guilty of Count 5, Attempt to Commit First Degree Murder.

f. The Court committed an error of law, denying Defendant's motion to Suppress evidence relating to the July 8, 2014 seizure of a handgun from a Lexus in Philadelphia (contained in Court's Order dated April 4, 2017).

## ANALYSIS

In his first five issues, Appellant broadly alleges that the evidence was insufficient to sustain his conviction of First Degree Murder, Conspiracy to Commit First Degree Murder and Attempt to Commit First Degree Murder.

The standard for evaluating the sufficiency of the evidence as announced by the Superior Court of Pennsylvania is

> whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [the above] test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered.

15

Commonwealth v. Fortson, 165 A.3d 10, 15 (Pa.Super. 2017) (*citation omitted*).

Initially, we note that Appellant's Statement of Matters is overly broad and lacks specificity. The Superior Court of Pennsylvania has observed that

> [i]n order to preserve a challenge to the sufficiency of the evidence on appeal, an appellant's Rule 1925(b) statement must state with specificity the element or elements upon which the appellant alleges that the evidence was insufficient. Commonwealth v. Gibbs, 981 A.2d 274, 281 (Pa.Super. 2009), *appeal denied,* 607 Pa. 690, 3 A.3d 670 (2010). "Such specificity is of particular importance in cases where, as here, the appellant was convicted of multiple crimes each of which contains numerous elements that the Commonwealth must prove beyond a reasonable doubt." Id. at 281 (citation omitted).

Commonwealth v. Garland, 63 A.3d 339, 344 (Pa.Super. 2013). Because the appellant in Garland "not only failed to specify which elements he was challenging in his Rule 1925(b) statement, he also failed to specify which conviction he was challenging," the Court found that his sufficiency claim was waived on that basis. Id.

In the instant matter, Appellant has also failed to identify with any specificity the elements upon which his insufficiency of the evidence claims are based. We therefore find that he has effectively waived those claims.

Despite our determination that Appellant has effectively waived his claims for lack of specificity, we nevertheless find no merit to Appellant's challenges to his conviction, and will address the broad issues identified in his Statement of Matters.

First Degree Murder

In evaluating Appellant's challenges to his convictions for First Degree Murder, we note the following:

> First-degree murder is an intentional killing, *i.e.,* a "willful, deliberate and premeditated killing." 18 Pa.C.S. § 2502(a), (d). In order to prove first-degree murder, the Commonwealth must establish that: (1) a human being was killed; (2) the accused caused the death; and (3) the accused acted with malice and the specific

16

intent to kill. The jury may infer the intent to kill based upon the defendant's use of a deadly weapon on a vital part of the victim's body.

Commonwealth v. Sanchez, 82 A.3d 943, 967 (Pa. 2013) (citations omitted). *See also* Commonwealth v. Chester, 587 A.2d 1367, 1372 (Pa. 1991) ("The use of a deadly weapon on a vital part of the body warrants an inference that the act was done with a specific intent to take life.").

Furthermore, "each member of a conspiracy to commit homicide can be convicted of first-degree murder regardless of who inflicted the fatal wound." Commonwealth v. Montalvo, 956 A.2d 926, 932 (Pa. 2008); *see also* Commonwealth v. Bronshtein, 691 A.2d 907, 912-913 (Pa.Super. 1997) ("all co-conspirators to a murder can be found guilty of first degree murder, regardless of who actually inflicted the wound which resulted in death").

The Supreme Court of Pennsylvania has also "held that where a defendant is not the actual slayer, but instead an accomplice or co-conspirator, to be guilty of first-degree murder, that defendant must also have had the requisite specific intent to kill." Commonwealth v. Miller, 819 A.2d 504, 509 (Pa. 2002).

Here, it is uncontroverted that the two victims died from gunshot wounds to the head. Overwhelming evidence places Appellant at the scene of the killings and corroborates his involvement in the murders. Demetrius Baker gave detailed testimony about Appellant's role in the planning of the robbery, his conduct inside the home, and his actions after the shootings. Kyle Stallworth testified about details given to him by the Appellant which were not known to those outside the investigation. Cell phone records also provided evidence that the phone locations were consistent with Appellant's presence at the murder scene.

The evidence, including the shell casings and bullet fragments retrieved from the crime scene, confirmed that multiple gunshots were fired from two different guns and that the bullets

17

retrieved from the victims' heads were fired from the Sig Sauer. The Sig Sauer used in the murders was found in the Lexus automobile used by Appellant and Christopher Wright after the murders.

The evidence of Appellant's conduct before, during and after the murders revealed his malice and shows that he shared the intent to kill. He provided the Sig Sauer which was used in the commission of the murders. He retrieved and kept the revolver from the victim's wheelchair before handing the Sig Sauer to King. He helped restrain the victims with the zip ties as they lay prostrate on the floor, and then he burned the victim Lamel Duffy with a hot knife and stepped on his hand while forcibly removing his wrist watch and jewelry. Appellant remained inside the home after proceeds of the robbery were removed, and he gave the directive to kill. As Appellant and King exited the house and returned to the car after the shots were fired, Baker observed that Appellant was happy. He admitted to Stallworth that he had shot one of the victims in the head. In fact, all three victims had been shot in the head at close range while they were bound. Appellant shared in the proceeds of the crime and he chose to engage in celebratory activity after the killings occurred. Finally, Appellant essentially bragged about his crime to Stallworth.

Appellant's conduct demonstrated his shared intent to kill the victims as well as a frightening hardness of heart. The evidence presented at trial was clearly sufficient for this Court to conclude that Appellant was guilty of first degree murder and we find no merit to Appellant's allegations of error in this matter.

## Conspiracy to Commit Murder

Appellant has also argued that the evidence was insufficient to support his convictions of two counts of Conspiracy to Commit First Degree Murder.

Criminal conspiracy is defined in pertinent part by 18 Pa.C.S.A. § 903 as follows:

18

§ 903. Criminal conspiracy

(a) Definition of conspiracy.--A person is guilty of conspiracy with another person or persons to commit a crime if with the intent of promoting or facilitating its commission he:

(1) agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or

(2) agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime.

(b) Scope of conspiratorial relationship.--If a person guilty of conspiracy, as defined by subsection (a) of this section, knows that a person with whom he conspires to commit a crime has conspired with another person or persons to commit the same crime, he is guilty of conspiring with such other person or persons, to commit such crime whether or not he knows their identity.

\*\*\*

(e) Overt act.--No person may be convicted of conspiracy to commit a crime unless an overt act in pursuance of such conspiracy is alleged and proved to have been done by him or by a person with whom he conspired.

\*\*\*

(g) Duration of conspiracy.--For purposes of 42 Pa.C.S. § 5552(d) (relating to commission of offense):

(1) conspiracy is a continuing course of conduct which terminates when the crime or crimes which are its object are committed or the agreement that they be committed is abandoned by the defendant and by those with whom he conspired;

\*\*\*

18 Pa.C.S.A. § 903.

It is well settled that

[i]n order to convict a defendant of conspiracy, the trier of fact must find that: "(1) the defendant intended to commit or aid in the commission of the criminal act; (2) the defendant entered into an agreement with another ... to engage in the crime; and (3) the defendant or one or more of the other co-conspirators committed an overt act in furtherance of the agreed upon crime." [Commonwealth v. Montalvo, 956 A.2d 926, 932 (Pa. 2008)]. ... Each member of a conspiracy to commit homicide can be convicted of first-degree murder, regardless of who inflicted the fatal wound. Id.

19

Commonwealth v. Bond, 985 A.2d 810, 818 (Pa. 2009). *See also* Commonwealth v. Johnson, 920 A.2d 873, 878 (Pa.Super. 2007) ("to sustain a conviction for criminal conspiracy, the Commonwealth must prove beyond a reasonable doubt that the defendant entered into an agreement to commit or aid in a criminal act with another person or persons with a shared criminal intent and that an overt act was done in furtherance of the conspiracy").

For the reasons stated previously, the evidence was more than sufficient to establish that Appellant was part of a conspiracy to commit murder.

### Attempt to Commit First Degree Murder

Appellant has next challenged the sufficiency of the evidence that resulted in his conviction for Count 5, Attempt to Commit First Degree Murder.

It is well-established that a "person is guilty of attempted murder if he takes a substantial step towards an intentional killing." Commonwealth v. Wesley, 860 A.2d 585, 593 (Pa.Super. 2004).

Here, the evidence revealed that not only did Appellant and Anthony King kill Joshua Johnson and Tyrone Moss by shooting each of them in the head at close range as they lay prostrate on the floor, but that they also severely wounded Lamel Duffy after Appellant gave the command to kill. Duffy was also bound and shot at close range in the back of his head and back. That shooting was undeniably a "substantial step by Appellant toward the intentional killing of the victim, and thus constituted attempted murder." Id.

### Motion to Suppress

Lastly, Appellant complains that this Court erred in denying Appellant's motion to suppress evidence relating to the July 8, 2014 seizure of a handgun from a Lexus automobile in Philadelphia pursuant to this Court's Order of April 4, 2017.

20

The Superior Court of Pennsylvania has stated that:

[t]he standard of review for the denial of a motion to suppress evidence is as follows:

> [An appellate court's] standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, [the appellate court is] bound by [those] findings and may reverse only if the court's legal conclusions are erroneous. Where ... the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to [ ] plenary review.

Commonwealth v. Jones, 121 A.3d 524, 526–27 (Pa.Super. 2015) (citation omitted).

Additionally, the Pennsylvania Supreme Court has ruled that when reviewing a motion to suppress evidence, we may not look beyond the suppression record. *See* In re L.J., 79 A.3d 1073 (Pa. 2013).

Commonwealth v. Smith, 164 A.3d 1255, 1257 (Pa.Super. 2017), *reargument denied* (July 31, 2017).

As previously noted, this Court issued an Order on April 4, 2017, denying Appellant's Motion to Suppress Evidence after conducting a hearing on March 15, 2017. That Order and the accompanying Findings of Fact, Conclusions of Law and Memorandum Opinion developed from the hearing which explain this Court's reasons for denying the motion to suppress are attached hereto as Exhibit "A."

For the reasons set forth in our memorandum Opinion, we find no merit to Appellant's challenge to our Order denying his motion to suppress the evidence of the seizure of the handgun.

21

## CONCLUSION

We therefore hold that Appellant's challenges to his convictions for First Degree Murder, Conspiracy and Attempted Murder are without merit, and we respectfully suggest that his appeal be denied and dismissed.

DATE: _Jan 18, 2018_                     BY THE COURT:

                                         _____
                                         REA B. BOYLAN, J.

22